**UNITED STATES of America,
Plaintiff,**

**v.**

**William H. SERMON, Defendant.**

**No. 21512.**

United States District Court
W. D. Missouri, W. D.

May 1, 1964.

---

F. Russell Millin, U. S. Dist. Atty., Calvin K. Hamilton, Asst. U. S. Dist. Atty., for plaintiff.

Harry A. Morris, Kansas City, Mo., for defendant.

JOHN W. OLIVER, District Judge.

This Memorandum and Order determines another preliminary matter in the same income tax case reported as United States v. Sermon, W.D.Mo.1963, 218 F. Supp. 871. In the earlier matter we ruled defendant's motion for bill of particulars and his motion for discovery and inspection and made further orders directing further proceedings in this case.

Thereafter, and following a series of conferences suggested in that Order, defendant, on September 19, 1963, filed a motion for examination of his mental condition pursuant to Section 4244 of Title 18 United States Code, and Local Rule 23 of this Court.

That motion and the attached supporting affidavit of defendant's personal physician were couched in the statutory language of Section 4244 and alleged that the defendant "is presently so mentally incompetent due to his physical disabilities as to be unable to understand the proceedings against him or properly assist in his own defense."

We sustained defendant's motion for an examination on September 20, 1963. By separate order entered September 23, 1963, we designated and appointed Robert H. Barnes, M.D., Executive Director of the Greater Kansas City Mental Health Foundation; Louis H. Forman, M.D., 4320 Wornall Road, Kansas City, Missouri; and Stanton L. Rosenberg, M.D., Department of Psychiatry, University of Kansas Medical Center, all qualified psychiatrists and all diplomates of the American Board of Psychiatry and Neurology, from the regularly appointed panel of this Court to serve as the panel of particular experts to act in this case.

The panel submitted an interim progress report on October 14, 1963, and requested an extension of time within which to submit a final report. In the meantime, Nathan Greenbaum, Ph.D., another expert member of our regular panel, was directed and authorized to assist the initially appointed panel. On November 14, 1963, the panel filed another report, assisted by Dr. Greenbaum. We accepted that report as a further interim progress report.

On the same day we also accepted the panel's recommendation that the defendant be committed to a suitable hospital for a reasonable period of time for further observation and evaluation. The Psychiatric Ward of the University of Kansas Medical Center was designated as a suitable institution. We therefore ordered that the defendant be committed to that institution for a period of thirty (30) days, which period we determined to be a reasonable period within the meaning of Section 4244 and our Local Rule 23. The panel observed and evaluated the defendant further during that period of commitment.

We accepted the panel's final report on January 2, 1964. By letter dated January 10, 1964, to all members of the panel and to counsel, we directed further proceedings in the case; established a schedule for the filing of briefs on particular legal questions; and requested the presentation of factual data *in camera* for our study and consideration.

That letter also set the matter for hearing to be held on February 12, 1964.

The hearing was held on that date. The parties have recently confirmed by stipulation their earlier advice that it was their desire that the Court make the findings required by Section 4244 on the basis of the medical testimony adduced by Drs. Barnes, Forman and Rosenberg, and by Dr. Greenbaum, the exhibits admitted in evidence at the February 12, 1964 hearing, and on the basis of all the data heretofore submitted, both *in camera* and in open court. We shall approve that stipulation for reasons that we shall state later and therefore proceed to make the judicial determination required by Section 4244.

We are required by law to make a judicial determination of the question of whether or not the defendant is "presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense," within the meaning of Section 4244 of Title 18 United States Code.

The precise question for decision in this case, because of the language used in the report of the panel of experts, is narrowed to a judicial determination of whether defendant is "presently insane or otherwise so mentally incompetent as to * * * *properly assist in his own defense.*" [1]

The language of the statute and the language used in the panel's final report are not exactly the same. The panel of experts expressed its "considered opinion that Mr. Sermon is not sufficiently intact to be able *to adequately assist his counsel.*" The statute uses the words "*to * * * properly assist in his own defense.*"

We do not think nor do we consider that the slight variance between the language of the statute and the language used by the experts in their report, i. e., the difference between competency "to properly assist in his own defense" [the language of the statute] and "to adequately assist his counsel" [the language of the report] is of any particular importance because, in the final analysis, the decision to be made pursuant to Section 4244 is a judicial and not a medical determination.

The medical opinions expressed by the doctors are but one factor that must be placed in the judicial balance. We therefore shall treat with the substance of the report of the panel; not its form.

In such treatment, we must, of course, consider the facts and reasons upon which the panel's conclusion was based. We therefore note at the outset that the conclusion in the report of the panel was based "in part on our [the panel's] mental status evaluation" of the defendant and that such evaluation took into particular account the panel's judgment that "in particular [defendant's] remote memory is quite spotty and at times recent memory also appears defective." (Exhibit 2 in February 12, 1964 hearing).

The same report of the panel also stated that its judgment was "in part * * * based on the psychological test data which indicates moderately severe impairment of intellectual functioning with definite deterioration in recent and remote memory, judgment, abstract thinking and visual-motor coordination." That panel added that "the findings on both the mental status examination and the psychological tests point toward moderately extensive organic brain damage."

1. The panel of experts are in unanimous agreement that "it is our considered opinion that the defendant is not presently so mentally incompetent as to be unable to understand rationally the proceedings against him." For purposes of clarity, we quote the language of the panel's conclusion in context:

"It is our considered opinion that the defendant is not presently so mentally incompetent as to be unable to understand rationally the proceedings against him. However, regarding his mental capacity to assist his counsel in his own defense, it is the panel's opinion that Mr. Sermon is not sufficiently intact to be able to adequately assist his counsel."

(Exhibit C in the February 12, 1964 hearing.)

The electroencephalogram attached to the October 31, 1963 report of the panel stated an impression that defendant had a "Normal waking EEG." But the report of the panel, later confirmed at the hearing by testimony (Tr. 91–93), stated that "the normal electroencephalogram cannot be taken as contradicting [the panel's] diagnosis since approximately 50% of people with known extensive brain damage secondary to arteriosclerosis and other aging changes have normal tracings."

As we have indicated above, we requested that the defendant file a factual memorandum in which specific instances of the inability of the defendant properly to assist in his own defense would be stated. Such a factual presentment was voluntarily filed by the defendant. The Government filed its reply to that presentment. Those filings were studied before we heard the testimony of all four medical experts at the hearing held on February 12, 1964.

After the hearing was held on that date, we conferred further with counsel and then ordered that both parties amplify the factual presentations theretofore made. The Government thereafter filed, in camera, a detailed statement and analysis of the evidence that it would introduce upon trial of this case. At the same time the Government filed in open court its suggestions in support of its contention that defendant is competent to assist in his defense.

After we had studied the Government's in camera filing, we entered our order of March 26, 1964, in which we directed that the Government furnish a copy of the Government's in camera factual brief to defendant and his counsel. That order was entered on the express condition that neither defendant nor his counsel should reveal the contents to any other person unless authorized by this Court so to do.

The obvious purpose of our order of March 26, 1964, was to enable defendant and his counsel to have the fullest sort of information concerning the evidence that defendant might be required to meet and to be fully advised in regard to all factual data that the Court would consider in making its decision pursuant to Section 4244.

Defendant thereafter filed an in camera reply to the Government's factual brief and also filed, in open court, its suggestions in opposition to the Government's legal brief. We have carefully studied all of those filings. We, of course, do not comment in detail on the information contained in the in camera filings for obvious reasons. We have insisted from the outset that this case be tried in court and not in the public news media.

On April 13, 1964, and on April 20, 1964, the Government and the defendant respectively filed affidavits of John F. Stewart, the operator of Wild Game Unlimited, a "controlled hunting" enterprise located near Paola, Kansas, and of Morris Jacobson, Claude Wilson, Lawrence (Pat) Moran, and Eugene W. Thiess that related to hunting expeditions made by defendant during the years 1962, 1963, and 1964.[2]

The formal stipulation of counsel states their agreement neither side desires any further hearing to adduce any additional testimony or evidence and that we should make our judicial determination on the basis of the evidence adduced at the February 12, 1964 hearing and upon all the data filed by both parties both in camera and in open court.

While under the facts of this particular case we proceed in accordance with the

---

2. While the different affidavits vary in detail as to how much and in what manner the defendant participated in the actual shooting of the "pen raised birds" at the Paola establishment [one affiant suggested that these birds "acted more like tame birds than wild birds"], there is no real dispute but that defendant did participate in some fashion in hunting expeditions on October 1, November 7, November 21 and December 5, 1962; on January 11, February 6, and February 27, 1963; and January 15, 22, 24, 29, 31, February 5, 14 [two days after the hearing in this case] and 28, and March 4, 10 and 13, 1964.

stipulated agreement of the parties, we believe that we would have power to order a further hearing if we deemed it necessary in order that justice be done. At the time of the hearing of the medical testimony, for example, we indicated that we felt that in this case there existed a possibility that a second hearing might be necessary at some later date in order that the medical evidence might be fully developed (Tr. 95).

The testimony of the doctors at the hearing on February 12, 1964, however, clearly established that the experts could only give their judgment in regard to defendant's present condition and that evidence of defendant's past performance, whatever it might be, would not alter their medical judgment of that present condition (Tr. 99, 101, 119, 131).

In view of that testimony, and in the absence of any request from defense counsel made at any time throughout the pendency of this Section 4244 hearing that the defendant be called to the stand to testify in connection with this proceeding, we approve the stipulation and proceed to make the judicial determination required by the statute.

Defendant's contention that "for this Court to rule that the defendant is able to assist counsel in defendant's defense, this Court would have to over-rule, disregard, negate and hold for naught the considered (Transcript pps. 21 and 22) unanimous (Tr. 23) determination of its panel of psychiatric experts, approved by all judicial members of this District (Rule 23) and selected by this Court with the concurrence of counsel" is not tenable.

The medical opinion of the experts, expressed as it must be in the language of the statute, is not binding on this Court. That medical opinion is but one of the facts and circumstances that must be considered by the Court in making its determination of the basic legal question involved.

■ Apart from its required use of the language of the statute in its report, the panel reported its medical diagnosis and evaluation in the language of medicine. The real thrust of defendant's argument is that any diagnosis and evaluation of any degree of mental illness is conclusive evidence that a defendant is not competent to stand trial. Such a proposition can not be legally sustained. Slough and Wilson, in their article "Mental Capacity to Stand Trial," 21 U. of Pitts. L. Rev. 593, 595 (1960), posed and answered the question as follows:

"Is mental illness *per se* sufficient to preclude an immediate trial? Recognizing that implicit in any generalization is the possibility of inaccuracy, we answer that a diagnosis of mental illness, standing alone, is not, under any accepted standard, tantamount to mental incapacity to stand trial."

The Court is confident that its court appointed experts understand that the law imposes the duty and responsibility of ultimate decision of the legal question involved on the Court and not upon the medical experts. The thoroughness of the experts in this case has been of great assistance to the Court and it expresses its appreciation to all the experts for a job well done.

For centuries the law has recognized that a defendant who is so mentally disturbed that he cannot understand the proceedings against him or properly to assist in his own defense cannot be tried. Blackstone, writing in the 1760's, stated and inquired: "If, after [a defendant] has pleaded, he lose his reason, he shall not be tried, for how can he make his defense?" And certainly no one in the 1960's would dream of putting a defendant suffering from established amnesia to trial for a crime of any sort.

Of course, the problem in this case, as in all close cases, is how does one determine whether a particular defendant is sufficiently mentally competent properly to assist in his own defense? Does this particular defendant, in the language of Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), in fact have "sufficient present ability to consult with his lawyer with a reasonable

degree of rational understanding?" Does this particular defendant, again in the language of the same case, have "a rational as well as factual understanding of the proceedings against him?"

The single fact that the panel of outstanding and respected experts concur in a medical diagnosis that defendant is presently suffering from "(1) Chronic brain syndrome, secondary to cerebral arteriosclerosis, (2) Arteriosclerotic heart disease, Class 3–C, (3) Cataract, left, (4) Osteoarthropathy, left hip, (5) Obesity and (6) Diabetes Mellitus," does not controllingly answer those and similar questions. Our acceptance of that particular diagnosis does not command an agreement with the ultimate statutory opinion of the doctors in their report expressed in the language required by Section 4244.

The doctors made clear that both the disciplines of law and of medicine are struggling with relative concepts (Tr. 103, 107, 121) that must be determined without any firmly established criteria or a set of tests for guidance (Tr. 116).[3]

This case is completely unique, so far as we have been able to discover, in that the experts have no doubt but that the defendant is fully able "to understand the proceedings against him" but they also expressed an opinion, in the required statutory language, that the defendant is not able "properly to assist in his own defense." In all other cases the medical opinions expressed in regard to both questions have been the same.

Inquiry therefore must be directed to how any defendant does in fact properly "assist in his own defense." Broadly speaking, one cannot properly assist in his own defense unless he can advise his counsel concerning the facts of the case as known to him and unless, if necessary, he can testify on his own behalf in the cause concerning those facts.

The element of memory, of course, comes immediately into focus in regard to both facets of factual inquiry. The medical evidence in this case focused on memory from the outset. In the preliminary report of October 14, 1963 (Exhibit A in the February 12, 1964 hearing), the panel stated that "there is evidence that his memory is not constantly clear and acute, and if this is crucial to his ability to advise with his counsel, it is a factor requiring consideration and further evaluation."

The panel also advised the Court then that "a more certain opinion of his mental ability to assist in his own defense, therefore, might be rendered if certain psychological studies and an electroencephalogram were obtained and made available." The panel also then called attention to the medical fact that defendant's "remote memory is quite spotty and at times recent memory also appears defective."

The testimony of all the doctors, after the benefit of further tests and after a period of observation and evaluation during defendant's commitment, confirmed the spottiness of defendant's memory (Tr. 61–62, 104, 117). But most understandably, none of the doctors could testify what defendant actually remembers and what he does not remember. As explained by Dr. Barnes, "we have no microscope that we can look into the brain and pick out the ingrams and the neural circuits where that memory may be deposited, so I would have to agree that there is no objective measurement of whether this memory is really there or

---

3. The difficulties of communication and expression reflected by the testimony taken at the hearing on February 12, 1964 echo the discussion held November 6, 1961 at a Joint Meeting of the Special Committee on Procedures for Hospitalization and Discharge of the Mentally Ill, appointed by the American Bar Foundation and its Advisory Board of Psychiatrists. Mr. Alan D. Wade, consultant to the American Bar Foundation, then inquired and stated: "How can we develop better communication between psychiatrists in court and the judge * * *. This is what I think we are struggling with right now." Cf. Karl Menninger with Martin Mayman and Paul Pruyser, "The Vital Balance", Viking Press, 1963.

978

not, and one of the things that makes it more confusing is the fact that individuals such as Mr. Sermon with a chronic brain syndrome can remember something one day and the next day he can't and the next day he can." (Tr. 63–64).

The inability of the experts to determine what the defendant can and cannot remember from day to day is not to suggest that the defendant was feigning or that he was in any way guilty of malingering. All the doctors ruled out those possibilities (Tr. 40, 62–63, 112, 122–123, 125). But to rule out feigning and malingering does not answer the problems presented by this case. One can, without feigning or malingering, permanently forget the date of his wedding anniversary and any number of other matters, but still be perfectly competent to assist in his defense and to stand trial in a particular criminal case.

■ Defendants do not assist in their own defense by telling their lawyers what motions to file or how a particular witness should be examined, or cross-examined. As suggested in Lyles v. United States, 1957, 103 U.S.App.D.C. 22, 254 F.2d 725 at 729–730, cert. denied 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067, " '[t]o assist in his defense' of course does not refer to legal questions involved but to such phases of a defense as a defendant usually assists in, such as accounts of the facts, names of witnesses, etc." We think it must also be added that the primary assistance that must be rendered counsel is a full revelation of the facts within the knowledge of the defendant in areas which are in legitimate dispute. Inability to recall the ages of one's children or their grade in school, unless such facts are relevant and disputed, does not necessarily prevent a defendant from assisting in his own defense.

Specific and particular inquiry must be focused on what the facts show that defendant has remembered and what he has communicated to his counsel. Defendant's Section 4244 motion was not filed until six months after defendant was indicted. The factual data considered

by us indicates that the investigation of defendant's tax returns commenced in September, 1960; that he was contacted by agents of Internal Revenue Service on September 19, 23, 27 and 30, 1960; on October 12, 1960; on February 8, April 13, 1961; and on January 23, 1962. Defendant's CPA participated with defendant in the interview on October 12, 1960.

By the time of the January 23, 1962 interview, well over a year before defendant was indicted, defendant had employed his present counsel. Present counsel for the defendant was present with the defendant at the interview held that date. At that January 23, 1962 conference, the defendant, in the presence of his present counsel, made what he said was a full explanation of his sources of income. It is also evident from the material before the Court that both the defendant's CPA and his present counsel supplied various alleged leads and information to the Government that could only have come from defendant. And even subsequent to the indictment, but before the Section 4244 motion was filed, defendant's present attorney furnished various additional alleged leads in support of defendant's consistent theory of defense that he and his accounting and legal representatives have attempted to maintain from the outset of the investigation in 1960. We are satisfied beyond all reasonable doubt that defendant was fully able, and in fact did, furnish counsel with sufficient factual information which counsel could use in order to properly prepare defendant's defense.

We have not overlooked defendant's counsel's assertion that the "claim" that defendant was unable to assist in the preparation of his defense was made "before, at, and immediately after the return of the indictment against the defendant." It is suggested that "the contention of defendant's inability to assist was raised in the Court's presence at the first conference held with this Court together with Government attorneys in the Court's chambers"; that "prior to that it was raised at the formal conferences

in Omaha, Nebraska, and Washington, D. C."; and that "prior to the formal conferences it was raised at the informal conferences with the Revenue Agent and Special Agent."

Defendant concedes that any discussion in conferences with this Court at the beginning of this case held before the Section 4244 motion was filed concerning defendant's ability to stand trial was "not phrased in the formal language of \* \* \* Section 4244." Counsel correctly states that fact.

Nor has any factual data been presented by the defendant in support of the broad conclusory assertion that the question was raised at the formal and informal conferences with representatives of the Government. We must conclude that defendant's comments concerning defendant's ability to stand trial focused on defendant's physical condition as distinguished from his mental condition, as was the focus of the comments made to this Court before the Section 4244 motion was filed in September of 1963.

Defendant's assertion that Dr. Barnes testified that "defendant's 'chronic brain syndrome' had been continuing for 4 or 5 years which would fix the beginning of the decline in the defendant's mental ability long before the beginning of the investigation" is not supported by the record and is but a tortured construction of Dr. Barnes' testimony. Dr. Barnes made clear that any estimate of duration "would be merely a guess" (Tr. 49). Dr. Greenbaum testified that he thought that defendant's condition was of "comparatively recent" origin (Tr. 133).

We have no reasonable doubt but that defendant was able to and has in fact rationally consulted with and communicated to his lawyer his factual understanding of the proceeding against him.

The problem of whether defendant would be called upon and would be able to testify presents a more complicated problem. In the absence of any factual data to the contrary, we must and do assume that defendant would want to exercise his right to testify. We are therefore brought face to face with the question of what is, and what is not, in defendant's memory. But even more important, are there any indicated areas of factual dispute involved in this case in which it must or should be said that an assumed failure of defendant's precise memory is of such importance that his assumed inability to recall would deny him a fair trial?

Again we are confronted with a question of degree. Who and how can one say what is within and without the spottiness of defendant's present memory? The problem is further complicated by the fact that defendant's factual presentation fails to state definitely that the defendant would deny—or even that he is unable to recall—the specific transactions with particular individuals that the Government has fully outlined in the factual presentments that we ordered the Government to furnish for defendant's benefit.

We have studied and restudied the factual presentments of both parties and we can not find a sufficient indicated factual basis upon which to base a judicial determination that defendant is incompetent to assist in his own defense because of an inability to testify in his own behalf.

We have not overlooked the conclusory assertions made by defendant's counsel in the factual presentation filed in response to our direction that specific instances of the alleged inability of the defendant properly to assist in his own defense be stated.

As we stated earlier, we are not at liberty, for obvious reasons, to do more than speak in somewhat broad generalities concerning the factual data presented to us by both sides *in camera*. We shall, however, briefly discuss, in language that we believe will be understood by counsel, a few typical instances of where a broad contention of necessity of assistance is claimed in order to illustrate why we must consider that such a claim is not supported by the factual material that has been made available to both the defendant and to the Court.

On page 3 of defendant's presentation filed January 24, 1964, for example, it is asserted that "the fact of whether the deposits [in defendant's bank account] are by check or by cash is an important element in establishing 'Cash on Hand' or prior accumulated cash funds, at the beginning of the indictment period, January, 1956". Such a contention, of course, basically assumes the relevancy and materiality of whether deposits were or were not by check or cash, a fact which, if material and relevant, is quite capable of proof by other witnesses. It therefore becomes apparent that defendant's secondary and conclusory assertion that "defendant's recollection of the transactions is important; his testimony regarding their source is essential, and the provision of leads to his counsel and to the investigating agents is imperative" can not be sustained.

On page 4 of defendant's factual presentation, for another example, defendant's counsel inquires "where did he [the defendant] get the money to make certain investments." The suggestion of counsel that the defendant "was, still is and will continue to be unable to either answer or assist his counsel to find the answer, due to his permanently defective memory and lack of factual understanding of the proceedings against him" is a broad conclusion unsupported by the factual data made available for our study of this case.

Such a conclusion rests upon the unsupported assumption that some answer other than that which the Government's revealed factual presentation tends to support is, in fact, within the locked portion of defendant's memory. No factual suggestion of what such an answer might be is suggested by defendant's counsel. Nor does defendant's counsel suggest that defendant even wants to deny the testimony of particular witnesses or dispute the documentary evidence that has been disclosed by the Government pursuant to our prior orders.

We cannot conceive that a defendant who is competent to understand the nature of the proceedings against him is not also mentally alert enough to advise his counsel whether the broad outline of the evidence that the Government has indicated it will adduce against him is or is not fabricated.

For defendant's counsel to assert again on page 4 of the presentation that "if there was an answer to the factual enigmas now unanswered, that answer, explanation or defense rested solely in the defendant's memory, and the defendant alone could provide answers or leads" and that "accordingly, the defendant would, of necessity, be compelled to take the stand and testify" reflects and again emphasizes defendant's reliance upon the unsupported premise that some sort of unsuggested answer does in fact exist that would provide an "answer to the factual enigmas" that defendant's counsel suggests are present in this case.

Defendant's reluctance even to assert that he desires to take the stand for the purpose of disputing any portion of the case revealed by the Government's factual presentation or for the purpose of testifying that his memory is so blank that he does not remember anything about where the money came from indicates that defendant is content to rely solely on the medical evidence adduced at the hearing. As we have indicated, the scope of our factual inquiry must be much broader than that single portion of all the data that has been presented for our consideration.

As a final example, we note that the assertion of defendant's counsel on page 9 of the same factual presentation to the effect that "the defendant herein, because of his mental deterioration, has not and cannot furnish leads to the Government or his counsel to prove his innocence" is subject to the same frailty as defendant's other unsupported conclusions. It is also contrary to the underlying facts as we have found them above in regard to the furnishing of leads.

In further connection with this assertion of defendant's counsel, we must add that neither this nor any other defendant is under any obligation to "prove his innocence". This defendant,

as all defendants, is presumed to be innocent until proven guilty beyond a reasonable doubt. Defendant must also recognize, however, that so far as this proceeding pursuant to Section 4244 is concerned, this defendant, as all defendants, is presumed to be sane and mentally competent to stand trial until the contrary is established in accordance with applicable principles of law.

Without discussing other conclusory assertions in defendant's factual presentation in any further detail, we believe it sufficient to say that the factual material before this Court establishes beyond reasonable doubt that the defendant personally, through his C.P.A., and through his lawyer, did in fact furnish numerous leads to the Government and that all of those leads have been fully investigated.

We think it fair to say that, in the final analysis, no factual suggestion concerning defendant's inability to assist in his own defense is made in defendant's factual presentation that is not encompassed in the suggestion made on page 4 of defendant's brief filed March 4, 1964, where it was stated that "it was and still is the contention of defendant's counsel that this is a civil matter and the tax liability of defendant should be worked out by technical experts because of defendant's inability to assist rather than [by a] jury untrained in the various complex accounting methods utilized by the Government to prove a deficiency in income taxes by the defendant."

Such is the contention of most defendants charged with a criminal violation of the income tax laws of the United States. Such a contention does not establish a factual basis upon which a finding of mental incompetency properly to assist in a defendant's own defense may be based. If justice is to be done to all parties, findings must be based upon facts; not conclusions. We find no suggestions of the existence of factual data in the full record presented for our study and consideration upon which a finding of incompetency on the part of the defendant to assist in his own defense could reasonably be based. In short, we are convinced beyond reasonable doubt that the presumption of sanity and competency has not been overcome.

We are, of course, convinced that the defendant is not as mentally alert as he once was. But even if one should accept Dr. Greenbaum's quite vivid language that the results of psychological tests administered by him to defendant (Rorschach, Wechsler-Bellevue Test of Adult Intelligence, Bender-Gestalt Test of Memory were among the tests administered) convinced him that "this man is now but a shell of his former self," we still have to face the fact that Dr. Greenbaum also stated in his report that "this man is by no means totally incapacitated".

To the judicial mind it is not conclusive evidence of mental incompetency to stand trial that this defendant, as many defendants before him about whom no question of mental competency was raised, "has narrowed his effective sphere of participation and involvement to much constricted limits, and he avoids confrontation with situations which threaten his sense of mastery and adequacy," as is further stated in Dr. Greenbaum's report.

The judicial mind is and must be regulated in part by presumptions that experience has established as valid. Our judicial determination must take into account that valid experience at least to the extent that some factual data be presented that would indicate that the spottiness of defendant's memory and his alleged inability to testify is directly related to his ability to receive a fair trial. We have no reasonable doubt but that such a showing has not been made in this case.

We must and do therefore find that defendant is not "presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense", within the meaning of Section 4244 of Title 18, United States Code, and that defendant's case should be set for trial.

In connection with that trial, the attention of counsel is directed to that portion of Section 4244 that provides that "[a] finding by the judge that the accused is mentally competent to stand trial shall in no way prejudice the accused in a plea of insanity as a defense to the crime charged; such finding shall not be introduced in evidence on that issue nor otherwise be brought to the notice of the jury."

While there has 'not been the remotest sort of suggestion that the defendant was not mentally competent at the time of the alleged commission of the offenses charged, we believe it helpful, in view of the trial date established by this order, to discuss our view of the scope of that portion of Section 4244 in order that such trial proceed in a prompt and orderly manner.

First, we want to make clear that the judicial inquiry that we have conducted pursuant to Section 4244 and our findings made pursuant to that Section are not to be brought to the attention of the jury in any fashion by either side during the trial. The testimony and exhibits adduced at the February 12, 1964 hearing and all briefs and factual presentations filed pursuant to this Section 4244 proceeding are included within the scope of this direction and order.

■ Secondly, and perhaps more important, so far as the trial itself is concerned, we now indicate our view that Section 4244 was not intended by the Congress nor does it have the legal effect of foreclosing a defendant from his common law right to raise, as a matter of factual defense to be determined by the trial jury, such a defense at the time of trial. It is our view that the common law defense of present insanity is available to a defendant in a federal court and that it may be raised under a plea of not guilty.

Youtsey v. United States, 6 Cir. 1899, 97 F. 937, decided in 1899 by then Judge, but later Mr. Justice, Lurton, was decided long before the Congress passed any legislation concerning how determinations of mental competency should be made in the trial or criminal cases in the federal courts. That case, in an enlightened opinion, recognized that a federal court had the same wide discretion established by the common law to see that justice be done in particular cases in which the common law defense of present insanity was presented.

That case held that "[i]t is fundamental that an insane person can neither plead to an arraignment, be subjected to a trial, or, after trial, receive judgment, or, after judgment, undergo punishment" (l. c. 940 of 97 F.).

That case also held that "[i]f present insanity does not appear until the trial has begun, the court may submit the objection to the jury along with the principal issue, requiring a special verdict as to the competency of the defendant to understand the proceeding and intelligently defend himself." (l. c. 941 of 97 F.).

United States v. Chisolm, Cir.Ct.S.D. Ala.1906, 149 F. 284, another landmark case in the development of the law of mental competency, illustrates how a federal trial judge, in the middle of a trial and without the benefit of statute, suspended the trial on the merits of the criminal charge in order to receive evidence and submit separately to the jury the question of whether "the mind of the defendant at the bar [is] so far from normal and so impaired by disease as to make it improper and unjust to keep him on trial for the offense for which he has been arraigned." (l. c. 290 of 149 F.)

We do not believe that the Congress intended by enactment of Section 4244 to destroy the flexible common law power available to federal courts prior to the codification of but a portion of the common law by that section. We shall conduct the trial of this case in accordance with that determination.

We, of course, do not know whether defendant will or will not wish to present the defense of present insanity to the jury. Nor do we suggest any course of action for him.

We only decide here that our judicial determination of competency in this Sec-

-tion 4244 proceeding does not foreclose his common law right to make and present a defense of present insanity at the time of trial.

We see no basic procedural or substantive differences between the presentation of a defense of insanity at the time of the commission of the offense and a defense of present insanity. We recognize, of course, that in the federal practice, the only permitted pleas to an indictment are the pleas of guilty, not guilty, and *nolo contendere* (Rule 12 of the Federal Rules of Criminal Procedure). But it is clear, however, that the common law defense of insanity at the time of the commission of the offense and the common law defense of present insanity have both always been and are now available under a plea of not guilty. We shall so rule at the time of trial. Cf. United States v. Roe, W.D.Mo.1963, 213 F.Supp. 444, a case involving insanity at the time of the offense.

 The Congress has not, as have many of the States, enacted any legislation that requires a defendant to file a notice prior to trial of any intended defense of insanity. The Oregon statute and the statutes enacted by many other states are cited and discussed in State v. Wallace, (1942) 170 Or. 60, 131 P.2d 222 at 235, et seq. Section 4.03 of the Model Penal Code proposed by the American Law Institute codifies the reasonable procedural requirement that the affirmative defense of mental disease or defect shall not be available at trial unless the defendant, before trial, files a written notice of his purpose to rely on such defense. Such a procedural requirement, as stated on page 241 of 131 P.2d of the Wallace case, "is in complete harmony with the modern doctrine in the entire procedural field, which is to require frank disclosure of issues and evidence and to avoid surprise and chicanery."

We have no doubt but that a federal court has inherent power to require a particular defendant to indicate whether or not he intends at trial to rely upon a defense of insanity. None of the Rules of Criminal Procedure are inconsistent with requiring such a procedural step to be taken. The purpose of those rules as expressed in Rule 2 is "to provide for the just determination of every criminal proceeding" and "to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." That stated purpose is consistent with such an exercise of our inherent power to regulate the trial.

Rule 57(b) of the Rules of Criminal Procedure recognizes the existence of such residual power when it provides that "[i]f no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules or with any applicable statute."

We are convinced that an order requiring defendant to file a timely written notice of his purpose to rely upon the defense of insanity is both lawful and that it is not inconsistent with either the Federal Rules of Criminal Procedure or with any applicable statutes of the United States. We therefore order that if the defendant intends to rely upon a defense of insanity at trial, he shall file a notice to that effect on or before May 15, 1964.

Such notice, if filed, shall clearly set forth the full scope of defendant's insanity defense; that is to say, whether defendant intends to defend solely on a defense of present insanity or whether he intends to rely upon a plea of insanity at the time of the commission of the offense. We make this specific requirement concerning the form of the notice, not because defendant has indicated any intention to rely upon any broader ground than that alleged in his Section 4244 motion, but because the evidence that the Government would be required to assemble in order to meet a defense other than present insanity would obviously be different.

For the reasons stated we formally find and judicially determine that defendant is mentally competent to stand trial and that the trial of this case should be and is hereby set to commence on June 1, 1964.

984

It is also ordered that if defendant intends to rely upon the defense of either present or past insanity, or both, he shall file an appropriate written notice of such purpose in accordance with what we have said above, on or before May 15, 1964.

It is so ordered.