**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Auckland HOLMES et al., Defendants-Appellants.**

**Nos. 17722–17729.**

United States Court of Appeals,
Seventh Circuit.

Oct. 7, 1971.

Rehearing Denied Dec. 1, 1971.

Certiorari Denied March 27, 1972.
See 92 S.Ct. 1291, 1302.

John Powers Crowley, Melvin B. Lewis, Frederick F. Cohn, Sam Adam, Frank W. Oliver, Anna R. Lavin, James S. Montana, Gerald M. Werksman, R. Eugene Pincham, Jo-Anne F. Wolfson, Edward M. Genson, Chicago, Ill., for defendants-appellants.

William J. Bauer, U. S. Atty., D. Arthur Connelly, Chief Civil Div., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Jeffrey Cole, Asst. U. S. Attys., of counsel.

Before SWYGERT, Chief Judge, PELL and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

Each of the eight appellants was convicted on one or more counts of an indictment charging conspiracy and substantive violations of the Federal narcotics laws.[1] The conspiracy allegedly continued from as early as August of 1966, to and including October 18, 1967. On that date an indictment which had been returned in March, and which named only five of the appellants as defendants, was superseded by a second indictment naming them all. The substantive counts related to four specific transactions, all of which were also identified as acts pursuant to the continuing conspiracy.

The first three transactions were purchases negotiated and consummated by one Hudson Bonner, an informer, who used Government funds, delivered the purchased heroin to Government agents, was under continual surveillance, and carried a concealed transmitter during his critical discussions with defendant Earl Matthews. On November 2, 1966, he obtained 29.5 grams of heroin, 24% pure, from Matthews for $675; on November 8, 55 grams for $1,200; and on December 7, 81.5 grams for $1,500. In each instance the money was paid to Matthews in advance and a series of conversations, usually by telephone, took place before Matthews finally advised Bonner where and when he would receive delivery of the heroin.

The fourth transaction was witnessed by 12 Government agents. It was an attempted partial distribution of 6,000 grams of heroin by defendants Matthews and Pearman to defendants Stephens, Oliver and Westbrook on the sidewalk in front of 7808 South Morgan Street in the evening of March 5, 1967. The heroin was in small packages, which in turn were carried in a large brown paper bag. As the five defendants were standing in a circle, three with hands outstretched to receive delivery, and Pearman with his hand reaching into the paper bag, one of the agents announced his office and placed all five under arrest. They scattered and fled in different directions, but all were promptly apprehended and the bag of heroin was recovered. Based on the prices paid by Bonner in the earlier transactions, the heroin seized on March 5, 1967, had a value of about $120,000.

The conspiracy encompassed not only the four specific transactions identified in the substantive counts, but other incidents as well. On January 25, 1967, Bonner had made an advance payment of $1,500 to Matthews who returned the funds several days later because he was unable to deliver the heroin. On the evening of March 5, 1967, when the five defendants congregated at 78th and Morgan, Bonner was waiting for Matthews in a nearby tavern to consummate a $2,000 purchase which they had previously arranged. One Willard Evans, original-

1. The relevant statutes are 21 U.S.C. § 174 and 26 U.S.C. § 4705(a). Section 174 (upon which Count I—charging conspiracy—and Counts III, V, VII and VIII are based) provided in part:

"Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. * * *

"Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

Section 4705(a) (upon which Counts II, IV and VI are based) provided:

"It shall be unlawful for any person to sell, barter, exchange, or give away narcotic drugs except in pursuance of a written order of the person to whom such article is sold, bartered, exchanged, or given, on a form to be issued in blank for that purpose by the Secretary or his delegate."

ly named as a defendant and severed before trial, testified that he also purchased narcotics from Matthews. On one occasion in November, 1966, he received a package of heroin from Matthews near 75th and Stewart immediately after he witnessed delivery of that package to Matthews by defendant Stephens who was a passenger in a station wagon driven by defendant Wilbert Holmes. Three of the five defendants arrested on March 5, 1967, had Wilbert Holmes' unpublished telephone number in their possession.[2]

Defendants Auckland Holmes and Earl Williamson were not shown to have been present at the delivery of any narcotics. Each was seen in the company of other defendants on various occasions. On one such occasion defendant Pearman exchanged attache cases with Auckland Holmes in a parked car; the case delivered to Holmes was filled with cash. On another occasion Auckland Holmes and Earl Williamson met in a car wash station and carried on a conversation which was partially overheard by two agents; in that conversation they referred to Pearman, to the transactions between Matthews and Bonner, and to the collections to be made the next day, and discussed the need to consult counsel about certain aspects of their business.

Statements by Matthews to Bonner, which were described in detail in Bonner's testimony, and many of which were overheard by agents via the concealed transmitter, contained a number of references which could fairly be understood to relate to Auckland Holmes, Wilbert Holmes and Earl Williamson, and to their participation at an executive level in the organized distribution of narcotics. Many of these references were in colloquial and ambiguous form, but the guilty verdicts require such evidence to be construed favorably to the Government.

Appellants have advanced a veritable spate of contentions. We have considered them all with care but find that only a few raise questions of substance. Each appeal has been briefed and argued separately, but we shall discuss the contentions in categories.

### I. *Sufficiency of the Evidence.*

Four of the defendants raise questions concerning the adequacy of the proof.

### A. *Wilbert Holmes.*

Wilbert Holmes was convicted on the conspiracy count but was not charged with any substantive offense. Assuming that the evidence of conspiracy was adequate as to the other defendants, he argues that his intent to cooperate in an unlawful enterprise cannot be inferred either from his presence when a single unlawful act was committed or from his mere association with conspirators.

In evaluating this argument we start with the premise that the existence and nature of the conspiracy has already been established, and that the evidence relating to Wilbert Holmes was all admissible and credible. The question is whether that evidence, taken as a whole, supports the conclusion that he was a knowing participant.

The witnesses Bonner and Evans made repeated purchases from the enterprise. In each instance the arrangements preceding the delivery by Matthews included precautions which would minimize the likelihood of observation or apprehension. The mere presence of a third party would strongly suggest that he was intended to perform a useful function in connection with the transaction.

In November of 1966, when a package of heroin was delivered to Matthews near 75th and Stewart, Wilbert Holmes was not merely present; he drove the car to what must have been a prearranged delivery point; he saw Stephens hand Matthews the package, and apparently engaged in a brief conversa-

2. Wilbert Holmes' address book contained unpublished numbers of four other defendants and the address of one.

tion with him. There is no question about the nature of the transaction itself (Evans having witnessed it and described it in his testimony) or about the fact that it was in furtherance of the conspiracy. It is reasonable to infer that Holmes knew exactly what was happening and that he was driving the station wagon at that time and place because he was a participant. That inference is not contradicted by any evidence offered on Holmes' behalf.[3]

■ On the contrary, it is corroborated by other circumstances. Participants in the conspiracy used unpublished telephone numbers; so did Holmes. They knew each other's unpublished numbers. Three of the five who were arrested as Pearman and Matthews were making a distribution from a bag of 6,000 grams of heroin had Wilbert Holmes' unpublished number in their possession, one on a matchbook cover and one on a scrap of paper. His address book, seized at the time of his arrest, contained Stephens' address and the unpublished numbers of defendants Williamson, Pearman and Westbrook, as well as his brother, Auckland Holmes. A business, rather than purely social, relationship between those defendants and Wilbert Holmes may reasonably be inferred. The only common business activities disclosed by the record was their joint participation in the distribution of heroin. Taking the evidence as a whole in the light most favorable to the Government, and noting the absence of contradictory evidence, the jury could properly infer that Wilbert Holmes was a knowing participant in the conspiracy when he and Stephens delivered a package of heroin to Matthews in November, 1966. That fact is sufficient to sustain his conviction under

Count I. See United States v. Spadafora, 181 F.2d 957, 959 (7th Cir. 1950) cert. denied, 340 U.S. 897, 71 S.Ct. 234, 95 L.Ed. 650.

B. *Auckland Holmes.*

According to the Government's version of the evidence, Auckland Holmes was the top executive in the joint venture.[4] His principal contention is that the evidence linking him to the conspiracy and to sales to Bonner is unworthy of belief.

He does not seriously attack the credibility of the evidence that Pearman delivered a briefcase full of cash to him in a parked car or the evidence of his association with other defendants. He concentrates his attack on the agents' testimony concerning the conversation with Earl Williamson which they claimed to have overheard in a car wash near 79th and St. Lawrence. He argues that the testimony is inherently incredible because an alleged mastermind of a million dollar narcotics business would not be so stupid as to permit himself to be overheard in an incriminating conversation in a public place; because the two white agents would obviously have attracted suspicion in the heart of a black neighborhood; and because the physical evidence, as explained by the owner of the station, made it impossible for the witnesses to have been standing at the location described in their testimony.

■ To reject these arguments we need not pass judgment on Auckland Holmes' business acumen. Even if we assume that the leader of a sordid enterprise, who entrusts $120,000 of merchandise to delivery from a paper bag on a street corner, is a man of genius, he might nevertheless suffer an occasional lapse of attention. The most obvious

3. Holmes argues that there is no evidence that the package which Matthews obtained from Stephens contained heroin. Although the court did instruct the jury to disregard Evans' conclusion that the substance in the package was heroin (TR. Oct. 25, 1968, p. 462), the jury could properly infer that it was heroin from the nature of the transaction and its similarity to other transactions which were described, as well as from the fact that Evans obviously believed it to be heroin since he injected some of it into his arm and some into the arms of his companions.

4. Auckland Holmes, Wilbert Holmes and Earl Williamson drove Cadillacs; Louis Pearman drove an Oldsmobile; Earl Matthews drove a Chevrolet.

subterfuge is sometimes least apt to be recognized. Moreover, the conversation might well have been meaningless to most casual listeners. Only because the agents were familiar with Bonner's purchases, and the fact that he had been buying less than $2,000 quantities, did most of the comments have any real significance. Of greatest importance, however, is the fact that the arguments addressed to credibility were made to and rejected by the jury. It is not our function to substitute our appraisal of witnesses that we neither saw nor heard for that of jurors who did observe and listen to them.

The physical evidence, which we will not relate in detail, does indicate some uncertainty or possible confusion as to the precise location of the agents with reference to the conversants. These points were stressed in argument to the jury. In our view they are of relatively minor importance and do not undermine the apparent reliability of what the witnesses testified that they heard.

■ Once the substance of this testimony is accepted, the evidence of Auckland Holmes' guilt is overwhelming. For then there can be no question as to the admissibility of comments of Matthews to Bonner relating to both Holmes and Williamson. United States v. Cerone, 452 F.2d 274, p. 284 (7th Cir. 1971). Without detailing this evidence, we simply state our conclusion that Auckland Holmes was found guilty beyond a reasonable doubt. He supervised or directed the activities of Pearman and Matthews and, therefore, aided and abetted the commission of the substantive offenses.[5]

## C. *Earl Williamson.*

Williamson challenges the sufficiency of the evidence that he aided and abetted the sales to Bonner on November 2, November 8, and December 7, 1966, and also the evidence of conspiracy. The latter contention is that there is no evidence of his knowledge of illegal importation of drugs.[6]

The argument with respect to the substantive counts is that the incriminating evidence obtained by overhearing Williamson's conversation in the car wash on January 25, 1967, merely proved subsequent knowledge of the earlier offenses rather than advance planning or participation in them. It is true that the conversation occurred after the offenses, but as we understand its relationship to the record as a whole, it plainly proves that Williamson aided and abetted the earlier sales.

■ Apart from the importation question, there is no doubt as to the sufficiency of the evidence of Williamson's participation in the conspiracy. The day after the car wash conversation he was observed accepting a stack of currency from Pearman. The conversation with Auckland Holmes clearly identified him as a superior to Pearman in the venture and indicated that he had issued instructions relating to the sales to Bonner. His participation in the joint venture being clear, Matthews' conversations with Bonner were admissible against him. United States v. Jones, 438 F.2d 461, 466 (7th Cir. 1971) In those conversations Williamson was again identified as a principal in the transactions. We are satisfied that the evidence establishes Williamson's guilt on the substantive counts.

---

5. The Government argued that his participation in the conspiracy established his responsibility for all substantive offenses committed thereto. Pinkerton v. United States, 328 U.S. 640, 647, 66 S.Ct. 1180, 90 L.Ed. 1489. However, the case was not submitted to the jury on that theory and, therefore, Pinkerton is inapplicable.

Nye & Nissen v. United States, 336 U.S. 613, 618, 69 S.Ct. 766, 93 L.Ed. 919. We hold that the evidence is adequate on the aiding and abetting theory embodied in the trial court's instructions.

6. This argument would also seem to apply to Counts III, V, and VII. Williamson, however, limits his contention to Count I.

■■ If we correctly understand his argument on the conspiracy count, he contends that the Government must prove that a defendant either had physical possession of heroin or that he had actual knowledge of its illegal importation. Physical possession gives rise to a valid statutory presumption that defendant knew of the illegal importation. Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610. We think the evidence was sufficient to prove that Pearman and Matthews, both of whom had physical possession of heroin in the regular course of their illegal business, were subordinates of Williamson in that enterprise, and that he had sufficient control over them to make the presumption applicable to him as well. *Cf.*, United States v. Maroy, 248 F.2d 663, 666 (7th Cir. 1957); United States v. Dillard, 376 F.2d 365 (7th Cir. 1967). It would pervert the purpose of the statutory presumption to apply it to the delivery man but not to his supervisor.

### D. *Nathaniel Westbrook.*

Westbrook also contends that the statutory presumption is inapplicable to him because there is no proof that he had possession of any narcotics. His argument is stronger than Williamson's because the jury found him not guilty on the conspiracy count. He was convicted only on Count VIII relating to the transaction on March 5, 1967, when five of the defendants were arrested.

Notwithstanding the jury verdict on the conspiracy count, the March 5 incident was sufficient to establish Westbrook's participation in the joint venture,[7] and, therefore, to make the evidence relating to the other defendants admissible against him. Based on the procedure followed in making sales to Bonner and Evans, as well as Matthews' statements to the effect that deliveries would not be made unless paid for in advance, including specific comments on the March 5 transaction, it is reasonable to infer that Westbrook had already paid for the heroin which he had extended his hand to receive when the agents aborted the delivery. He was on the verge of obtaining physical possession of narcotics when arrested.

Westbrook contends that since he was a customer of Pearman and Matthews, rather than their superior, it is inappropriate to treat their possession as his for purposes of construing the statute. He relies on Hernandez v. United States, 300 F.2d 114 (9th Cir. 1962), holding that possession of narcotics by one conspirator is not necessarily imputed to all other participants in the conspiracy. The court held that, in view of the broad application of general principles of conspiracy law, the rational basis for the statutory presumption did not necessarily encompass conspirators who had neither actual possession nor "dominion and control" over the drug.

> "Engrafting the doctrines of vicarious liability taken from the general law of conspiracy upon the presumption of guilt in this highly penal statute would extend the statutory presumption over so wide and uncertain an area of conduct, and with such severe consequences to the actors, that it is a step not to be taken by a court without clear congressional direction." 300 F.2d at 122.

We need not disagree with that holding to find that the legislative purpose of the statutory presumption is directly applicable to Westbrook.

■ The statute omits an otherwise essential element of proof because the defendant's possession of heroin creates the reasonable inference that he must have known that it has been illegally imported. Turner v. United States, 396 U.S. at 415–416, 90 S.Ct. 642, 24 L.Ed.2d 610. The fact of physical possession makes it reasonable to infer that the defendant has knowledge of the nature and

---

7. We may assume that the jury verdict of guilty on Count VIII is inconsistent with the verdict of not guilty on Count I without undermining the validity of either. Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356.

source of the product with which he is dealing. That inference is equally reasonable if the defendant himself does not have physical possession but one of his subordinates in the illegal venture does. We use the words "dominion and control" to ascribe possession to some conspirators, but we are actually determining that the legislative intent reasonably encompasses them if the circumstances support the same inference with respect to knowledge of importation as would physical possession itself. See 300 F.2d at 116, 118–119. Similarly here, it is plain that Westbrook was fully aware of the nature of the substance for which he had already paid, and can as reasonably be charged with knowledge of its illegal importation as if his outstretched hand had actually gripped the packet of heroin. In our view it is fair to test defendant's "possession" within the meaning of the statute by his proximity to the heroin itself and the nature of his participation in a transaction which he must have fully understood. We do not believe a fair construction of the statute requires independent proof of Westbrook's knowledge of illegal importation in view of the posture of the delivery at the time of his arrest. Congress did not intend to draw such a delicate line.

Although each of the defendants has adopted all of the arguments made by the others, we find no other attack on the sufficiency of the evidence that merits discussion.

II. *The Fourth Amendment Contentions.*

Five of the defendants advance arguments founded on the Fourth Amendment.

A. *Wilbert Holmes.*

■ The indictment returned on March 22, 1967, did not name Wilbert Holmes as a defendant. On October 18, 1967, the grand jury returned a superseding indictment adding new defendants. The court authorized the issuance of arrest warrants for the additional defendants, including Holmes. Agents who then had his house under surveillance were immediately advised by radio to arrest him. After effecting entry to the house, an agent requested Holmes to identify himself. Holmes stated that his identification was in his wallet upstairs, where he then led the agent. In the master bedroom on the second floor Holmes indicated that the wallet was in a nightstand. The agent then opened the nightstand where he found the wallet, a loaded gun, and a telephone book containing the numbers of four of Holmes' co-defendants and the address of another.[8] Thereafter, the bedroom and other portions of the house were searched and various items were seized. The only item received in evidence, however, was the telephone book found in the nightstand.

Holmes does not question the propriety of his arrest but contends that the scope of the agent's search was unreasonable. Most of the parties' arguments concern the propriety of that portion of the search which followed the inspection of the nightstand. Even if reasonable limits were thereafter exceeded, we do not believe the record would warrant holding that an exhibit seized while the search was within proper limits would thereby be retroactively rendered inadmissible.

Although there is a possibility, as Holmes argues, that the request for

8. Presumably because the hearing on the motion to suppress was conducted before the Supreme Court decision in Chimel v. United States, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, the record is not entirely clear on the precise location of the telephone book when it was seized. We have accepted the following statement by Holmes' counsel as accurate:

"Of all the items seized, but one was put in evidence (Government Exhibit 29–

A). That exhibit was a telephone book, likewise found in the nightstand." Brief p. 29.

Even if that statement is inaccurate, under pre-*Chimel* standards it would appear that the seizure was proper. Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399; United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653.

identification was a subterfuge to obtain access to other portions of the house, such a request is proper police procedure and we believe the examination of the nightstand to have been a reasonable search incident to the lawful arrest. The district court properly denied the motion to suppress the telephone book.

### B. *Auckland Holmes.*

 Auckland Holmes was arrested in his apartment. Two address books and three business cards were seized during the search which ensued. In a footnote in his brief he suggests that arguments comparable to those advanced by Wilbert Holmes are applicable to him. It seems quite clear that the search of his apartment was reasonable under pre-*Chimel* standards.[9] Moreover, no motion to suppress these exhibits was made in the trial court.

### C. *James Oliver.*

Oliver was one of five defendants arrested on March 5, 1967. On the following day he appeared before a commissioner and was admitted to bail on condition that he execute a $10,000 bond. On March 22, 1967, he was indicted and the amount of his bond was increased to $25,000. Subject to the restraints imposed by the terms of his bond, Oliver was at large until October 18, 1967.

On that date a superseding indictment was returned before Judge Austin, who stated on the record that it should "be suppressed until such time as those named are in custody." He then entered an order authorizing the issuance of bench warrants for the defendants not named in the original indictment and further providing that the bond previously set for the other defendants, including Oliver, should "stand as bond in this instance." Although no new warrant for Oliver's arrest was issued, agents who apparently were advised of the new indictment by a radio communication did arrest him and, incident to that arrest, seized $6,029 in cash from his person. A motion to suppress the cash on the ground that the arrest was illegal was initially denied.[10]

Oliver's contention is the converse of Wilbert Holmes'. He does not question the reasonableness of the search if the arrest was valid; he argues, however, that the warrantless arrest was unconstitutional. The Government responds by pointing out that the return of the indictment established probable cause, see, *e. g.*, United States v. Amabile, 395 F.2d 47, 53 (7th Cir. 1968), vacated on other grounds, Giordano v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297, and, therefore, the agents had statutory authority to make an arrest. 18 U.S.C. § 3052, 26 U.S.C. § 7607.

 The issue is not resolved so easily. Not only must there be reason to believe that a prospective arrestee is guilty of a crime; in addition, there must be some purpose to be served by making an arrest. During the entire period between March and October 18, 1967, probable cause to believe that Oliver had committed an offense continued

---

9. See cases cited in note 8, *supra.*

10. The transcript indicates that there was a great deal of confusion on the legality of the arrest. Agent Cloud had testified that the October 18 arrest was on a warrant. Later in the trial, when testimony was about to be introduced on Pearman's second arrest, his counsel pointed out to the court that he could find no arrest warrants in the file on any of the original defendants. (TR. Nov. 18, 1968, p. 3123 ff) The issue was extensively discussed. (TR. Nov. 18–19, 1968, pp. 3123–3167) Mr. McDonnell, the prosecutor, at first told the court there were warrants for all defendants and that he had caused instructions to be sent by radio to the agents who, therefore, did not have the warrants in their possession. (TR. Nov. 18, 1968, p. 3127) He later told the court, however, that his files also indicated no warrants had been issued for the original defendants. (TR. Nov. 19, 1968, p. 3139) In view of the confused state of the record we must rely on Judge Austin's order authorizing warrants only for the defendants not named in the original indictment and continuing bail as to the other defendants.

to exist because he was under indictment. But since he had been admitted to bail, no purpose could have been served by continually rearresting him. Although at large, in contemplation of the law he remained in custody.[11] In historic terms, he was the prisoner of his bail.[12]

The return of the second indictment justified a review of his custodial status. Additional charges might have made a rearrest proper, to be followed either by termination of bail or a modification of its conditions. In Oliver's case, however, when the second indictment was returned, the judge ordered no change in his custodial status. The subsequent arrest, therefore, had no greater purpose than if there had been no second indictment.

■ We recognize that a variety of valid causes for a rearrest of a person admitted to bail may exist, see Carlson v. Landon, 342 U.S. 524, 546–547, 72 S.Ct. 525, 96 L.Ed. 547, but certainly the continuing knowledge of his possible guilt of the offense charged in the indictment is not itself sufficient; otherwise, harassment by continual rearrests could be justified by the continuing existence of "probable cause." The Fourth Amendment requires both a reasonable foundation for a charge of crime and also the avoidance of "rash and unreasonable interferences with privacy."[13] Since there was no valid justification for Oliver's arrest, we conclude that the search of his person on October 18, 1967, was prohibited by the Fourth Amendment, and the seized cash was inadmissible. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L. Ed.2d 142; see also Coolidge v. New Hampshire, 403 U.S. 443, 473–484, 91 S. Ct. 2022, 29 L.Ed.2d 564.

■ Our holding involves no determination of bad faith by the arresting officers. The record indicates that communication to the agents in the field, though prompt, was imperfect.[14] Nevertheless, we do not consider this case analogous to the good faith arrest of the wrong person resulting from an honest mistaken identification. *Cf.,* Hill v. California, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484. In view of the entry of the order which in substance continued Oliver's bail before he was rearrested, the mistake here was committed at headquarters. The good faith of the officers on the scene cannot remedy the improper instruction to make a purposeless, warrantless arrest. Both the Fourth Amendment itself and the admonition to the courts to eliminate "all unnecessary detention"[15] precludes justifying an otherwise illegal arrest by a mistake at headquarters, however much good faith belief there may have been that warrants had been authorized.[16]

At trial, the Government originally sought to justify Oliver's arrest on the ground that a warrant had, in fact, been issued. An agent so testified and the trial judge received the cash in evidence, though only against Oliver and only on the conspiracy count. After the error in the agent's testimony was discovered, the judge ordered the testimony stricken and instructed the jury to disregard it. The instruction was complete and unambiguous but nevertheless raises the question

---

11. The custody of bail is a continuance of the original imprisonment. Taylor v. Taintor, 83 U.S. (16 Wall) 366, 371, 21 L.Ed. 287. "Upon admission to bail, the accused is then not only in the custody of his bail, but he is also in the custody of the law." Commonwealth v. Miller, 105 Pa.Super. 56, 59, 160 A. 240, 241; Ryan v. Ebecke, 102 Conn. 12, 15, 128 A. 14, 15. "He is still, constructively, in the custody of the law. The dominion of the surety is a continuance of the original imprisonment." Matter of Lexington Surety & Indemnity Co., 272 N.Y. 210, 213, 5 N.E.2d 204, 205.

12. See Holmes, "The Common Law" pp. 249–50.

13. "These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime." Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879.

14. See transcript references cited in note 10, *supra.*

15. See Fed.R.Crim.P. 46(h).

16. See TR. 3127.

whether the prejudicial impact of the evidence was adequately removed.

The answer to this question is not free of doubt. Possession of that amount of cash would inevitably tend to prejudice the jury, particularly in a case in which other testimony indicated that heroin was generally being sold in quantities with a value of at least $2,000. The jury might well have inferred that Oliver had accumulated sufficient cash to make a purchase of three $2,000 packages.

On the other hand, several factors mitigated the prejudicial impact of the evidence. The judge twice instructed the jury that the evidence related only to Oliver, and more narrowly only to Count I.[17] Neither during the presentation of the evidence, nor during any subsequent argument to the jury, have we found that any significance was attached to the fact that $6,000 is a multiple of $2,000. On the contrary, the apparent purpose of the offer was merely to prove that Oliver was in possession of a large sum of money, which, since its source was unexplained, might represent the proceeds of sales of narcotics (rather than an accumulation of funds needed to make a purchase). This inference was largely dispelled by the series of questions which the judge propounded and which strongly indicated that the mere possession of such a sum was not probative of guilt.[18] Thereafter, as noted above, the court concluded that the arrest had been improper and that the evidence should not have been received. He then thoroughly and carefully instructed the jury that the evidence and all testimony relating to it was stricken and should not be given any consideration.

Finally, we are influenced by the unusually persuasive evidence of Oliver's guilt and the fact that the judge's final charge to the jury was exceptionally favorable to the defendant. In the context of the entire trial, we conclude that reversible error was avoided by the court's action in striking, and instructing the jury to disregard, the evidence. Cf., Throckmorton v. Holt, 180 U.S. 552, 567, 21 S.Ct. 474, 45 L.Ed. 663; Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476; United States v. Levi, 177 F.2d 827, 831–832 (7th Cir. 1949).

Our conclusion is not that the introduction of the evidence could have been termed harmless error, see Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, but rather that the curative instruction, taken in the context of the whole case, was sufficient to overcome any prejudicial impact the introduction of the evidence might otherwise have had. We believe our analysis of the issue is consistent with that of the Sixth Circuit in United States v. Jackson, 418 F.2d 786 (1969) on which appellants primarily rely. As that opinion makes clear, the difference in result is attributable to differences in the relative importance of the inadmissible evidence as opposed to the properly admitted evidence of guilt.[19]

D. *Earl Williamson.*

■ Williamson argues that he was prejudiced by the use of evidence improperly seized from Auckland Holmes and James Oliver. As we have indicated, we believe the seizure from Auckland Holmes was proper. The evidence seized

17. See TR. 2668; 2686–87.

18. A portion of the court's interrogation was:
 "The Court: And you say you have seen six thousand dollars before?
 "The Witness: I have, sir.
 "The Court: Now, is it your intent to indicate as a result of your testimony that there was something wrong with this six thousand dollars?
 "The Witness: I don't intend nothing, sir.

 "The Court: As far as you know, there was nothing wrong with the six thousand dollars, isn't that right?
 "The Witness: Yes, sir."
 TR. Nov. 14, 1968, pp. 2682–83.

19. The court there stated, in part:
 "The inadmissible testimony and exhibits were by far the most direct and probative evidence of the decisive elements of dominion and control; the rest was circumstantial and far from overwhelming." 418 F.2d at 789.

from Oliver was admitted only against him and ultimately stricken in its entirety. Moreover, Williamson has no standing to object to the invasion of another's privacy. Alderman v. United States, 394 U.S. 165, 171–172, 89 S.Ct. 961, 22 L.Ed.2d 176.[20]

E. *Louis Pearman.*

Pearman contends that the introduction into evidence of conversations between Bonner and Matthews which were electronically overheard by federal agents without Matthews' knowledge or consent violated his Fourth Amendment rights. Pearman has no standing to raise this point. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176. Moreover, under the Supreme Court's recent decision in United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453, the contention, even if made by Matthews, would have to be rejected. The alternative grounds for that decision are both present here since Bonner was a "trusted accomplice" of Matthews, see 401 U.S. at 751–753, 91 S.Ct. 1122, and their conversations took place before Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576, was decided; see 401 U.S. at 754, 755–756, 91 S.Ct. 1122.

III. *Contentions Relating to the Testimony of Willard Evans.*

Evans identified defendants Stephens and Wilbert Holmes. His testimony also corroborated other evidence explaining the nature of defendants' business. He was originally indicted but severed after agreeing to cooperate with the Government. Defendants contend that his identifications were the product of improper police suggestion, that they were prejudiced by his masquerading as a defendant before his cooperation was disclosed,

and that their right of cross-examination was unfairly restricted.

In view of the importance of Evans' testimony, the trial judge permitted defense counsel to conduct an extensive *voir dire* examination out of the presence of the jury. Some of the facts related in the following chronology were, therefore, not brought to the jury's attention.

At the time of trial Evans was 42 years old; he had been taking narcotics on and off for about 18 years; he sold heroin to pay for his habit.

In August of 1966 he made a $2,000 purchase of heroin from defendant Matthews; he saw Matthews give that money to Pearman.

In early November 1966 he met Matthews in the vicinity of 75th and Stewart. While waiting in his car he saw Matthews cross the street, meet a dirty white Pontiac station wagon with a chrome strip missing from the left rear fender, and obtain a package of heroin from its two occupants; he ultimately identified the driver as Wilbert Holmes and the passenger, who handed the package to Matthews, as Stephens.

On March 1, 1967, Evans made a payment of $3,000 to Matthews for narcotics to be delivered a few days later. Evans was arrested on March 5, 1967, near 78th and Morgan with heroin in his possession. He was not present when the group of five defendants was apprehended in front of 7808 Morgan, but he was apparently placed in the same lockup with them shortly after the arrest.

On March 15, 1967, Bonner, the informer, met with Matthews who had been released on bond. Bonner had paid $2,000 to Matthews prior to March 5, 1967, but had not received the promised merchandise because Matthews' arrest had forestalled delivery. Accordingly, the purpose of the meeting on March 15

20. We recognize that McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153, is not expressly overruled by *Alderman* and might survive on the theory that there is a distinction between standing to make a motion to suppress illegally seized evidence and standing to object to

admissibility. The majority's comments concerning *McDonald*, however, lend no support to this theory. See 394 U.S. at 173 n. 7, 89 S.Ct. 961. Moreover, we believe that it is foreclosed by the rationale of *Alderman*.

**264**

was to obtain reimbursement of the $2,000. The events of March 5, as well as future operations, were discussed at some length. Bonner was wearing a concealed transmitter. In the course of the discussion Matthews stated that Evans was suspected of being an informer because he had not called since March 5 and his bond was lower than that of the other defendants.

Prior to April 10, 1967, Evans' wife received a threatening telephone call. On April 10 Evans advised the Government of his desire to cooperate; on that date he gave a statement to narcotics agents in which he described the transactions in early November. In that statement he said he did not know either of the occupants of the station wagon but believed that he could identify the driver if he saw him again.[21] In answer to a specific question, Evans said he did not know Boysie Stephens and had first seen him in the lineup on March 5, 1967, after their arrest.

After April 10 agents showed Evans pictures of various persons in an attempt to identify the occupants of the station wagon. He made tentative identifications of both Stephens and Holmes. On April 20 he testified before a grand jury and apparently stated that he did not know who the occupants of the station wagon were.[22] That grand jury did not return any indictment which is relevant here.

On May 15, 1967, while riding with agents in the vicinity of 81st and Champlain he recognized the station wagon with the missing strip of chrome that he had seen in November. It was parked in front of Holmes' residence and subsequently proven to be his property. A few days later agents told Evans that Holmes lived near 81st and Champlain.

On October 18, 1967, when the superseding indictment was returned, Evans was again arrested and placed in a lockup with the other defendants (and possibly other prisoners as well). He then recognized Holmes.

On November 2, 1967, Evans gave another statement to the Government in which he identified Holmes as the driver and Stephens as the passenger in the station wagon.

On November 17, 1967, defendant Pearman moved to sever defendant Evans on the ground that he was a Government informer, having previously cooperated with the prosecutor in a 1962 narcotics case. The motion was denied.

In February, 1968, an earlier indictment against Evans was dismissed on motion of the Government.

On October 17, 1968, the Government moved to sever defendant Evans on the ground that he was going to be a prosecution witness. The motion was granted.

Against this background we consider appellants' specific objections to Evans' testimony.

A. *Wilbert Holmes.*

Holmes argues that his identification by Evans "in the absence of counsel" was so suggestive as to deprive him of due process of law. He relies on United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and related cases.

Numerous facts bearing on the reliability of Evans' identification are discussed at length. These matters were also argued to the jury and are pertinent to the credibility issue,[23] but do not, in our opinion, undermine the integrity of the police procedures.

We recognize that photographic identification procedures may be "so impermissibly suggestive as to give rise

21. Under cross examination Evans testified that on April 10 he had told the agents that he believed he could identify both occupants of the station wagon.

22. Evans was cross-examined about his testimony before the grand jury (see TR. Oct. 28, 1968, p. 694), but the grand jury

transcript itself is not part of the record before us.

23. On the question of identification the court gave instructions which fully protected the defendants; the identification instruction was tendered by one of the defendants.

to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247. However, such was not the case here. Quite obviously the photographs were shown to Evans in an attempt to ascertain the identity of the occupants of the station wagon, not for the purpose of corroborating a preconceived police theory. Moreover, the use of the photographs did not produce any final, or to use the Court's word, "irreparable," identification of Holmes. Indeed, it was not until after his arrest in October that Evans was able to make a positive identification. Finally, the corroborative evidence, including the station wagon itself, makes it clear that this is not a case of misidentification. No "irreparable misidentification" resulted from the inspection of the photographs.

■■ Secondly, we find nothing improper in the drive through the neighborhood where Evans identified the station wagon. Counsel argues here, as he did before the jury, that the identification was the product of police suggestion. Certainly that is a possibility, but both Evans and the agents testified to the contrary; the jury was entitled to credit their testimony.

■■ Finally, appellant apparently contends, without expressly so arguing, that placing all of the defendants in the same lockup was a subterfuge for a line-up. He impliedly argues that Holmes was entitled to have counsel present at that time. The unstated predicate for the argument is that the "confrontation" between Holmes and Evans, which occurred when both of them were temporarily incarcerated in the same jail, was a "critical stage" in the prosecution of Holmes. See United States v. Wade, 388 U.S. at 227, 87 S.Ct. 1926, 1932.

The argument might be valid on either of two hypotheses. First, a court might rule that any time an arrestee is detained in the presence of a group of other prisoners arrested at about the same time, the risk of suggestive identification is great enough to require the presence of counsel. Notwithstanding the broad language in the *Wade* opinion requiring scrutiny of "*any* pretrial confrontation of the accused," *ibid.*, we are satisfied that it does not lay down any such broad and impractical rule. *Cf.*, Simmons v. United States, 390 U.S. at 384, 88 S.Ct. at 971.

Second, on the particular facts before it, a court might conclude that the detention of a suspect in the company of one or more potential witnesses was a mere subterfuge for a lineup. A review of the evidence relating to the processing of these defendants at the police station at Eleventh and State persuades us that such a conclusion would not be warranted here.

There is nothing in the record to support a claim that the arrests pursuant to the superseding indictment were made for the purpose of enabling Evans to view the suspects. It is reasonable to infer that he was processed like the other arrestees because he had been named as a co-defendant in the same indictment, and the Government was not then prepared to make known his status as an informer. Proper concern for the protection of an important potential witness explains why he would be processed in a routine fashion.

Unquestionably Evans' identification of Holmes in the lockup may have been influenced by his relationship to the investigation. However, the record does not support the conclusion that it was the product of improper police suggestion. There was no "one man lineup" such as that involved in United States v. Gilmore, 398 F.2d 679, 682 (7th Cir. 1968); see also Foster v. California, 394 U.S. 440, 443, 89 S.Ct. 1127, 22 L.Ed.2d 402; Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199. No Government agents were present during the custodial "confrontation." We do not believe the principle of the *Wade* case required the Government to provide Holmes with counsel in the lockup as a precondition to the admissibility of Evans' identification testimony. Moreover, we are satis-

fied that there was no "substantial likelihood of irreparable misidentification." In short, we conclude that Holmes' argument raises an issue of credibility rather than fair procedure.

### B. *Boysie Stephens.*

Stephens points to a number of factors which suggests that his identification by Evans was less reliable than Holmes'. He then argues that his conspiracy conviction rests on nothing but that improper identification, and for that reason "the agents went out of their way to get Evans to fabricate testimony."

In making this argument, Stephens ignores the fact that he was one of the five conspirators arrested on March 5, 1967. That incident was in itself sufficient to establish his participation in the conspiracy, as well as the substantive offense committed on that date. Since no substantive charge was predicated on the November, 1966, transaction, his identification by Evans was not critical to the Government's case.

The record, therefore, does not support the premise on which Stephens predicates his charge that the agents fabricated testimony against him. Nor do we think there is any merit to the claim that the facts raise anything other than a credibility issue. *Cf.,* United States v. Gornick, 448 F.2d 566 (7th Cir. 1971).

### C. *Auckland Holmes.*

Holmes moved to dismiss the indictment, and in the alternative, to strike Evans' testimony on the ground that his true status was not disclosed until the eve of trial even though he had been cooperating with the Government since April 10, 1967. It is argued that the Government's tactics had a "chilling effect" on counsel's ability to cooperate with one another since they could not know which lawyer might represent another "Judas goat."

We find no merit whatsoever in this argument. The Government was under no duty to make a final decision on the disposition of the charges against Evans any earlier than it did. After all, the circumstances could change before the trial date. The prosecutor's desire to use Evans as a witness might be frustrated in various ways, including his recalcitrance or fear induced by a renewal of the threats made in April. Before the Government made its final determination to sever Evans it had no duty to advise the defendants of his cooperation. There is not the slightest evidence that Evans' lawyer betrayed any professional obligation to the court, to his client, or to other defense counsel.

Neither the Government nor Evans nor his counsel breached any duty to the other defendants or their counsel. Moreover, the "chilling effect" contention is not buttressed by any showing of prejudice, either real or imagined.

### D. *Louis Pearman.*

Pearman requested the court to order Evans to submit to physical tests to determine whether he was addicted to drugs at the time of trial. The trial judge determined that such tests were not necessary. The court also denied Pearman's request for disclosure of the address where Evans was being held in protective custody. Pearman argues that he was, therefore, denied a fair opportunity to test Evans' credibility.

As already noted, the trial judge permitted defense counsel to conduct an extensive *voir dire* examination of Evans before he testified in the presence of the jury. He thus afforded them a much better opportunity to test his credibility on cross-examination than was necessary. The question whether medical tests should be required, and whether the location of his protective custody need be disclosed, were matters of discretion for the trial judge. We think he exercised it correctly.

### IV. *Contentions Relating to Earl Matthews.*

Shortly after the return of the superseding indictment Matthews was shot in the head by an unknown assailant. Brain surgery was performed on No-

vember 14, 1967, and again on November 20, 1967. He remained in the hospital until the end of December. On February 26, 1968, Matthews' counsel filed a motion pursuant to 18 U.S.C. § 4244 for an examination to determine his competency to stand trial. The court appointed Dr. Zane Parzen to conduct the examination, and later held a pretrial hearing at which several witnesses, including Dr. Parzen, testified. The court ruled that Matthews was competent to stand trial and denied a motion for severance.

Several contentions relating to Matthews are raised. Matthews urges (1) that he should have been permitted to present his defense of "present insanity" to the jury; (2) that the finding of competence was clearly erroneous; and (3) that in reliance on the court's assurance that he could raise a "present insanity" defense before the jury, he offered no other defense. Other defendants contend that they were prejudiced by the refusal to sever Matthews and that post-arrest as well as earlier statements by Matthews were improperly admitted against them.

### A. The "Present Insanity" Defense.

The trial court construed 18 U.S.C. § 4244 as requiring the question of the competency of the accused to stand trial to be decided by the court and not the jury.[24] This construction is supported by the plain language of the statute[25] and by decisions of other circuits. United States v. Davis, 365 F.2d 251, 256 (6th Cir. 1966); United States v. Huff, 409 F.2d 1225, 1228 (5th Cir. 1969); Hall v. United States, 410 F.2d 653, 658 (4th Cir. 1969) cert. denied 396 U.S. 970, 90 S.Ct. 455, 24 L.Ed.2d 436.

Even if the statute should be construed to allow the judge discretion either to resolve the issue himself or to submit it to the jury, in the circumstances of this case the judge exercised his discretion wisely. For a complete explanation of the medical evidence would inevitably have brought the attempted assassination to the attention of the jury—to the possible prejudice of other defendants. In our opinion the trial judge did not err in his construction of § 4244.

Matthews argues, however, that even if the question of competency is a matter for the determination of the court, "present insanity" is a separate defense which he had a right to present to the jury. For this contention he relies on United States v. Sermon, 228 F. Supp. 972, 982–983 (W.D.Mo.1964).[26] That opinion does support the contention, but we believe the common law precedents on which that court relied[27] have been superseded by the enactment of § 4244.

The statute expressly provides that the judge's finding that the accused is mentally competent to stand trial "shall in no way prejudice the accused in a plea of insanity as a defense to the crime charged." As we read that language, the defense of insanity refers to the defendant's mental state at the time of the alleged offense, not at the time of trial.

24. "THE COURT: Yes, and my consistent position has been that the question of present insanity or incompetency was a question which under Section 4244 may not be brought before the jury. It is a matter to be decided on by the Court. This is by statute." (TR. Dec. 3, 1968, p. 4683)

25. The statute refers to a "judicial determination" of mental competency and to the "finding by the judge."

26. "It is our view that the common law defense of present insanity is available to a defendant in a federal court and that it may be raised under a plea of not guilty.

&ast; &ast; &ast; &ast; &ast;

"We see no basic procedural or substantive differences between the presentation of a defense of insanity at the time of the commission of the offense and *a defense of present insanity.* &ast; &ast; &ast;" (Emphasis supplied). 228 F.Supp. at 982–983.

27. Youtsey v. United States, 97 F. 237 (6th Cir. 1899); United States v. Chisolm, 149 F. 284 (S.D.Ala.1906).

There is nothing in the record to suggest that Matthews could properly assert that defense. We reject his contention that there is a defense of "present insanity" which he had a right to raise before the jury. Accordingly, the court properly rejected his offer to prove present insanity to the jury.

### B. *The Finding That Matthews Was Competent.*

 Matthews contends that the finding that he was competent to stand trial is clearly erroneous. The finding was supported by the opinion of the court-appointed psychiatrist, as well as the testimony of other witnesses and the judge's own observation of Matthews in the courtroom. The test of competency as stated in Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824, (per curiam) was met by the doctor's opinion that Matthews knew the nature of the charges against him and was able to cooperate with counsel. The record does not support the argument that this conclusion was clearly erroneous.

Matthews places great reliance on expressions by the trial judge showing concern for his condition and indicating a continuing interest in the question of competency. The court may well have considered the issue a close one, but his actual ruling is obviously of greater importance than his comments in colloquy with counsel. He ruled that Matthews was competent, the ruling was made after giving the question careful consideration,[28] and it is supported by the evidence. We, therefore, will not disturb it. See Feguer v. United States, 302 F.2d 214, 236, 238 (8th Cir. 1962).

### C. *Matthews' Claim That He Was Entrapped By The Court.*

 Matthews argues that he offered no other defense to the charges because he relied on a ruling by the court that he would be allowed to offer an insanity defense, which the court then rejected.

We find the argument supported by nothing but a misconstruction of the trial judge's explanation of his consistent position. He repeatedly and consistently ruled that the question of competence to stand trial, which he properly equated with "present insanity," was an issue which he would determine and which could not be raised before the jury. He also properly advised counsel that this ruling would not foreclose the traditional defense of insanity if Matthews elected to raise it. His comments to counsel were perfectly clear and, in our opinion, could not reasonably have been construed as an assurance that a defense of "present insanity" could be presented to the jury.

The evidence of Matthews' guilt is overwhelming and undisputed. Nothing in his brief or argument contains the remotest suggestion that he had even the germ of a possible defense that he failed to raise in reliance on any ruling by the court. On the contrary, the record strongly supports the Government's suggestion that counsel endeavored to manipulate the word "insanity" in colloquy with the court in an unsuccessful attempt to inject error into the record:

"The Court: I trust counsel wasn't baiting the Court into this situation by sending up these alternative questions.

"Mr. Lewis: Before God, your Honor, I wasn't. Your Honor's question calls for me to state what my attitude is toward this Court. I thought the Court would have known it without my saying so. It is one of profound respect, personal regard and resolve that, *although I am most assuredly not above attempting to get error into*

---

28. After the competency hearing but before commencement of the trial, the judge ruled that Matthews was competent to stand trial. TR. Oct. 17, 1968, p. 228. During the trial Matthews' counsel made an offer of proof on his "present insanity" defense. The court denied the offer but reconsidered the 18 U.S.C. § 4244 competency question in light of the proposed proof and again ruled Matthews competent to stand trial. TR. Dec. 3, 1968, pp. 4715–16.

*a record in a criminal case,* I would not deliberately do it in this courtroom, sir." (Emphasis supplied) (TR. Oct. 21, 1968, p. 487)

### D. *Impact of the Denial of Severance of Matthews on Other Defendants.*

■ Auckland Holmes, joined by other defendants, argues that he was prejudiced by the denial of severance of Matthews. He contends that he was prevented, as a matter of tactics, from cross-examining Bonner or the narcotics agents because that was a responsibility of Matthews' counsel which he failed to perform in mistaken reliance on the court's assurance that he could present his "insanity" defense.

We have already concluded that the denial of severance is supported by the finding of Matthews' competence, and that the record does not support an argument that Matthews was misled by the trial judge. Moreover, Holmes must accept the consequences of his tactical decision not to cross-examine important witnesses. Before each witness left the stand Holmes' counsel certainly was aware of the fact that no cross-examination had been conducted on behalf of Matthews.

### E. *Post-Arrest Electronic Surveillance.*

■ After the original group of defendants was arrested on March 5, 1967, the investigation of the narcotics operation continued. The informer Bonner repeatedly tried to telephone Matthews and finally arranged to meet with him on March 15. At that meeting he wore a concealed transmitter which enabled Government agents to overhear significant incriminating statements by Matthews. At that time, although his indictment had not yet been returned, Matthews was represented by counsel.

Defendant Oliver contends that the statements deliberately elicited from Matthews by Bonner at the instance of the agents were inadmissible under Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246. Although that case involved a post-indictment investigation, we agree with Oliver that its rationale applies equally to a post-arrest surveillance. We also reject the Government's claim that the statements were unrelated to the March 5 incident which resulted in Matthews' arrest; the original indictment returned on March 22 contained a conspiracy count, and the March 15 admissions were relevant to that charge.

Nevertheless, we find Oliver's argument insufficient. The objection identified in *Massiah* is based on the defendant's constitutional privilege against self-incrimination and his right to the assistance of counsel at critical stages of the proceedings against him.[29] It is, therefore, an objection which might be available to Matthews, who made the incriminating statements, but not to a third party whose crimes were disclosed by Matthews.[30] Oliver has no standing to assert Matthews' privilege against self-incrimination.[31]

29. "We hold that the petitioner was denied the basic protection of that guarantee [Sixth Amendment right to counsel] when there was used against *him* at *his* trial evidence of his *own* incriminating words, which federal agents had deliberately elicited from *him* after *he* had been indicted and in the absence of *his* counsel." Massiah v. United States, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246. (Emphasis supplied.)

30. "All that we hold is that defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against *him* at his trial." 377 U.S. at 207, 84 S.Ct. at 1203. (Emphasis in original.) See also Alderman v. United States, 394 U.S. 165, 171–172, 89 S.Ct. 961, 22 L.Ed.2d 176, making the same point as to alleged Fourth Amendment violations.

31. *Cf.* United States v. Castro, 438 F.2d 468, 470 (7th Cir. 1971). The testimony was not offered or admitted against Matthews.

F. *Admissibility of Bonner's Statements to Matthews.*

Pearman argues that conversations between Bonner and Matthews are not admissible as to him for two reasons: (1) that Bonner, a Government informer, was improperly described in the indictment as a "co-conspirator"; and (2) that the conspiracy exception to the hearsay rule is unconstitutional.

■ Because Bonner was described as a co-conspirator, Pearman argues that the instructions permitted the jury to consider his separate acts to be the acts of Pearman. The argument rests on a partial reading of the instructions and is not directed at any specific evidence relating to Bonner. The only transactions in which Bonner engaged that could be considered to have been "done in furtherance of the objects of the conspiracy" within the meaning of the instructions were his purchases from Matthews. Each of these transactions involved Matthews as well and, therefore, was not only performed in the presence of a co-defendant, but was, in fact, partially performed by the co-defendant Matthews. There is nothing whatever in the record to suggest that any independent act of Bonner's could have been regarded by the jury as evidence of any defendant's guilt. We find no basis for Pearman's claim that he was prejudiced by the description of Bonner as a co-conspirator.

■ The question raised by Pearman's second argument was presented to the Supreme Court in the certiorari petition filed in Bostic v. United States, 400 U.S. 991, 91 S.Ct. 462, 27 L.Ed.2d 438. Pearman suggests that the grant of certiorari in that case demonstrates that he has raised a question of substance. However, we note that the Court has since entered an order dismissing the petition, 402 U.S. 547, 91 S.Ct. 2174, 29 L.Ed.2d 102, which seems to indicate that the grant of certiorari was not predicated on the same issue raised here by Pearman. Furthermore, on the same day the Supreme Court denied certiorari in Andrews v. United States, 402 U.S. 995, 91 S.Ct. 2170, 29 L.Ed.2d 160. The Ninth Circuit's decision in that case reaffirmed the validity of the joint venturer exception to the hearsay rule. See United States v. Griffin, 434 F.2d 978 (9th Cir. 1970). We, therefore, consider it appropriate to resolve this issue on the basis of existing precedent under which Pearman's contention must certainly be rejected.[32]

## V. *Prosecutorial Misconduct.*

Appellants contend that they were deprived of a fair trial by certain acts of misconduct by the prosecutor and by Government agents.

### A. *Closing Argument.*

■ The two agents who had overheard the conversation between Auckland Holmes and Earl Williamson in the car wash at 79th and St. Lawrence were in the courtroom during the closing argument by the prosecutor. At his suggestion they were wearing casual clothes similar to those worn when they were in the car wash station. In his argument the prosecutor made these statements:

"After following Auckland Holmes and Earl Williamson on January 25th Hughes and Rendina, two agents—and they are sitting in the courtroom today, they look like policemen—I look like more—if I was out there following them you could say, 'Well, McDonnell, with a red face, busted nose, he looks like a policeman,' but if you look at these fellows, they look like a couple of people who are in there getting their car washed—" (TR. Dec. 16, 1968, p. 6271)

Holmes and Williamson contend that this was an improper use of demonstrative evidence; an argument based on evidence not in the record; an attempt by the prosecutor to become an unsworn witness; and a denial of their right to

---

**32.** See cases cited in United States v. Cerone, 452 F.2d 274, pp. 282–283 (7th Cir. 1971).

cross-examination since the incident occurred after all parties had rested.

The testimony of these two agents had been of critical importance. They had been subjected to an extensive merciless cross-examination. Their appearance as white customers in a car wash station primarily patronized by Negroes, and their dress on the day in question, had been the subject of inquiry and argument. As defendants persuasively argue, their appearance in the courtroom in casual clothes probably added credibility to their testimony.

But wherein lies the error? There was no appeal by the prosecutor to passion or prejudice—only to reason.[33] The appearance of witnesses is always a factor that is weighed in appraising their credibility. That appearance is seldom reflected in the printed record and is not necessarily confined to the time they are actually testifying. It is not error for a lawyer to advise witnesses or parties as to the kind of clothing that may appropriately be worn in court, and we find nothing improper in the suggestion made to the agents here. There was no restriction on defendants' right to cross-examination or of proper argument.

### B. Tampering With Evidence.

██ Pages were torn out of an address book seized from Wilbert Holmes, placed in the front of the book, and then names and telephone numbers of defendants were circled in red. Address books seized from Auckland Holmes were also marked. Each document was the property of a defendant and should not have been marked or mutilated without his consent. In the context of this protracted trial, however, the incident is not of sufficient importance to constitute reversible error.

### C. Reference to Defendant Oliver as "Pee-Wee."

██ A card in Auckland Holmes' possession contained the name "Pee-Wee" opposite a telephone number. An agent testified that defendant Oliver was known by that nickname. The name "Pee-Wee" appeared on Oliver's arrest sheet, but the evidence as a whole casts considerable doubt on whether he was ever known by that name.

Late in the trial defendant adduced evidence to prove that the number in the address book had belonged to a Mrs. Richardson; that her niece, who was a friend of Holmes, was known as "Pee-Wee"; and that she was the person identified in the book.

Holmes and Oliver contend that the prosecutor knowingly and falsely attempted to identify the number as belonging to Oliver. If the Government was mistaken, as it appears to have been, there is no reason to believe that the mistake was deliberate. Indeed, a prosecution misstep of this kind might well redound to the benefit of defendant who was thereby presented with an opportunity to point to a plain flaw in the Government's case. In any event, we regard the matter as presenting only an issue of fact for the jury to determine.

### D. Pearman's Claim That The Prosecutor Commented On His Right to Remain Silent.

Pearman argues that in the presentation of evidence and in closing argument the prosecutor improperly called the jury's attention to his constitutional right to remain silent.

#### 1. The Testimony.

In their description of the arrest on March 5, 1967, the agents testified that

---

33. We note also that the prosecutor's statement referred to the officers without any comment on their dress; he did not say that the particular clothes they were wearing in court were the same as those worn at the car wash. Since the jury heard the prior testimony as to dress, including the cross examination, we have no reason to believe that they did not consider the appearance of these witnesses in the context of their testimony, as the jury might do with any witness who is in the courtroom at times other than when he is testifying.

the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, were given to the arrestees, including Pearman.[34] Agent Pringle was then asked about his colloquy with Pearman:

"Q. After you advised him of his constitutional rights, what did you say to him, if anything?

"A. I asked him if he knew Earl Matthews, Nathaniel Westbrook, James Oliver and Boysie Stephens.

"Q. What did he say?

"A. No." (TR. Nov. 25, 1968, p. 4084)

▮ Pearman inconsistently argues (a) that his statement that he did not know his co-defendants was inadmissible because the evidence does not establish that adequate warnings were given, and (b) that the reference to the warnings was an improper comment on his right to remain silent. Neither argument is valid. The record indicates that the warnings were adequate.[35] Since there was no testimony that Pearman requested counsel or asserted a right to silence, the cases such as Baker v. United States, 357 F.2d 11 (5th Cir. 1966) on which Pearman relies for his improper comment contention are not applicable.

▮ Pearman has also argued that the word "no" in answer to the Government agent's question at the time of his arrest was a "statement" called for by his discovery motions. As we read those motions, however, they called for written statements or confessions, or oral statements which were transcribed verbatim or in substance by a Government employee. We do not believe the word "no" in answer to a Government agent's question at the time of his arrest falls into either of those categories. Accordingly, there was no writing which the Government was required to disclose. See Fed. R.Crim.P. 16(a) and (b).

2. *The Argument.*

▮ Pearman also contends that the prosecutor improperly argued that the defense had failed to explain certain testimony. The challenged comment was made in the prosecutor's rebuttal argument and quite clearly referred to the failure of Pearman's counsel to answer points which the prosecutor had made in his initial argument. It cannot reasonably be construed as a comment on Pearman's failure to take the witness stand. *Cf.*, United States v. Davis, 437 F.2d 928, 932–933 (7th Cir. 1971).

34. With respect to defendant Oliver, agent Pringle testified:
"A. In that location I interviewed him, I told him that he did not have to make any statements without having an attorney present, any statement he did make could be used against him. I told him that he had the right to have an attorney appointed by the Court if he could not afford one, and if at any time during the interview he wanted to stop, he had the right to do so." (TR. Nov. 25, 1968, p. 4081)
With respect to defendant Pearman, he testified:
By Mr. McDonnell:
"Q. What if anything, did you say to Pearman at this time?
A. I advised him of his rights. I said—
The Court: Shall we go through this or—

Mr. McDonnell: Well, I was just going to ask—
By Mr. McDonnell: .
Q. Did you tell him the same things you told Mr. James L. Oliver concerning his constitutional rights?
A. Yes."
(TR. Nov. 25, 1968, p. 4083)

35. In any event, as we read the record, Pearman's only objection was to the agent's testimony that the warnings were given. See TR. Nov. 20, 1968, pp. 3548–9; TR. Nov. 25, 1968, pp. 4083–4. Nowhere do we find a request for a hearing on the admissibility of Pearman's statement or even an objection to its admissibility. *Compare* United States v. Nielsen, 392 F.2d 849, 852 (7th Cir. 1968).

### E. *False or Misleading Bills of Particulars.*

■ Wilbert Holmes argues that the principal evidence against him concerned the transaction at 75th and Stewart in early November, 1966, when he and Stephens delivered narcotics to Matthews, who then gave the package to Evans. He contends that the Government's Bills of Particulars concealed its intent to offer evidence of this transaction and thus deprived him of a fair opportunity to prepare his defense.

Although we think Holmes correctly criticizes the Government's responses as incomplete because they did not expressly identify him and Stephens at that important meeting, we believe they fairly apprised the defendants that this transaction would be a part of the Government's case.[36] Moreover, in view of the interval between Evans' testimony on October 23, 1968, and the conclusion of the trial on December 16, 1968, Holmes had ample time to assemble such rebuttal evidence as might tend to cast doubt on Evans' recollection of the incident.

### VI. *Other Claimed Errors.*

A number of additional points are raised. We identify only those we consider most significant.

■ A. Westbrook contends that the delay caused by the superseding indictment deprived him of the crucial testimony of his nephew, who was in the army in Germany at the time of trial, and who could have testified that Westbrook was in the vicinity of 78th and Morgan on March 5, 1967, for the purpose of meeting him. That purpose, however, was explained by Mrs. Westbrook who did testify. It does not refute the force of the Government's evidence relating to the actual arrest; and, in any event, a temporary leave for the nephew had been arranged which would have enabled him to testify if Westbrook had considered his testimony sufficiently important to justify the expense of his travel.

■ B. Oliver was the only defendant to take the stand. He contends that the court improperly sustained objections to questions asking for his "purpose" in being at the Cougar Lounge and his purpose in leaving that lounge to go to 78th and Morgan on March 5, 1967. He made no offer of proof describing the excluded testimony. We, therefore, have no way of knowing whether it would have added anything of significance to the record. In view of his participation in the actual distribution of heroin a short time later, it is extremely doubtful that the exclusion of testimony about his purpose in visiting or leaving the tavern could have been prejudicial.[37] In the absence of an offer of proof we will not speculate about its possible impact. See Rule 103(a) (2) Proposed Rules of Evidence For United States Courts and Magistrates (Mar.1971).

■ C. Pearman contends that the jury was improperly advised that an agent's testimony had been interrupted because of the death of his father. The statement was true and we fail to perceive any reason why a correct explanation for the interruption should not have been given to the jury. Pearman's argument that the jury might have been unduly swayed by sympathy for the witness is without merit. The jury certainly has the experience and intelligence to appraise the significance of such an ordinary misfortune.

■ D. Williamson complains that the trial was permeated with "asides," "grimaces," expressions of disbelief, and other improper conduct by the prosecutor. Such behavior is not to be condoned but unfortunately it is a rare trial

---

36. At least two of the Government's replies to the requests for particulars specifically identified "75th and Stewart" as a place where Evans and Matthews met.

37. He had previously told an agent that he had a date with an anonymous friend.

**274**

that can last for almost two months without some undignified displays by one side or another. On the whole, our examination of the record indicates that the trial judge maintained proper decorum and made sure that the defendants' rights were fairly protected. We find no substance in this contention.

■ E. Williamson also complains of the excessive use of aliases in the indictment. There is merit to the complaint but we find no basis for concluding that any defendant was prejudiced thereby.

■■ F. Wilbert Holmes advances the novel contention that the evidence before the grand jury did not establish probable cause for his indictment. We have not reviewed the grand jury transcript, but the Government's brief states that agent Pringle testified before the grand jury. Evans had described the November, 1966, transaction to Pringle, had made a tentative identification of Wilbert Holmes and a definite identification of his station wagon. Such hearsay, as well as the product of the agent's investigation, could properly be considered by the grand jury even if not admissible at trial. Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397. Since we have concluded that admissible evidence established Holmes' guilt beyond a reasonable doubt, we presume that the grand jury found probable cause to return an indictment.

In view of the fact that the eight appellants elected to file eight separate briefs when it is manifest that a joint presentation of at least their common contentions would have resulted in a more orderly statement of their arguments and an easier task for the court, we have not deemed it necessary to discuss, or even to identify, every contention that has been advanced. We are nevertheless satisfied that all grounds for appeal have been considered. Accordingly, the convictions of all eight appellants are affirmed.