In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 19-2108

TAPHIA WILLIAMS, et al., individually
and on behalf of those similarly situated,

*Plaintiffs-Appellants*,

*v.*

THOMAS J. DART, Cook County Sheriff, et al.,

*Defendants-Appellees*.

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cv-01456 — **Harry D. Leinenweber**, *Judge*.

---

ARGUED MARCH 31, 2020 — DECIDED JULY 23, 2020

---

Before KANNE, WOOD, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. "In our society," the Supreme
Court has said, "liberty is the norm, and detention prior to
trial or without trial is the carefully limited exception." *United
States v. Salerno*, 481 U.S. 739, 755 (1987). Not as a statistical
matter, says the Bureau of Justice Statistics. See *Jail Inmates in
2018*, at 5 (2020), available at bjs.gov/content/pub/pdf/ji18.pdf
(in 2018, 490,000 jail inmates (two thirds of total) had not been

convicted of offense). To better enforce the norm and police the exceptions more carefully, Cook County, Illinois, like other jurisdictions across the country, recently revised its pretrial detention policies in favor of broader access to pretrial release.

The plaintiffs in this case allege that defendant Thomas Dart, the Cook County Sheriff, disagreed with the revised policies and substituted in their place policies of his own making that denied them release. Plaintiffs are nine black residents of Chicago, arrested and charged with felonies, whom the Cook County trial courts admitted to bail subject to electronic monitoring supervised by the Sheriff. According to plaintiffs, the Sheriff independently reviewed plaintiffs' bail orders and decided they should not be released on those conditions. As a result, plaintiffs were neither released on monitoring nor left at liberty. Instead, they languished in the Sheriff's jail for up to two weeks after the bail orders were issued while their families and lawyers scrambled to find out what was happening. Motions for rules to show cause were filed. Two plaintiffs were released in the dead of night, hours before the motion hearings could be held.

Plaintiffs allege federal constitutional and state-law claims on behalf of the nine named plaintiffs and a putative class of other arrestees whose bail orders were disregarded by the Sheriff. After three rounds of pleading, the district court dismissed most of the suit for failure to state a claim. Plaintiffs abandoned the balance and took this appeal. We reverse in part and remand. Plaintiffs' allegations are sufficient to proceed on federal constitutional claims for wrongful pretrial detention and denial of equal protection, and on state-law claims for contempt of court.

I.  *Factual and Procedural Background*

  A.  *Plaintiffs' Allegations*

Because the case comes to us on bare pleadings, we as-sume the following facts to be true and state them in the light most favorable to plaintiffs. *Manistee Apartments, LLC v. City of Chicago*, 844 F.3d 630, 633 (7th Cir. 2016). In September 2017, with the support of the other branches of government, the Cook County Circuit Court implemented new pretrial release policies aimed at reducing the use of cash bail. This was done for the sake of fairness (poor people cannot afford it) and pub-lic safety (the most successful robbers and drug dealers can). For people arrested on felony gun charges, the new policies resulted in rates of pretrial release subject to electronic moni-toring that were eleven times higher than before. Before the reforms, 0.7 percent of persons on release were charged with a new violent crime before trial. After the reforms, from Sep-tember 2017 to February 2018, rates of recidivism on the same or similar charges for people charged with gun felonies rose but remained low (2.5 percent).

By February 2018, despite the low re-arrest rates in gun cases, the Sheriff had taken a dim view of these developments. The Sheriff superintends the Cook County Jail, and since 1989 his office has operated Cook County's electronic monitoring program. In a public letter to the president of the Cook County board of commissioners and in the press, the Sheriff expressed his view that the wrong people from the wrong neighborhoods were being released on monitoring. Accord-ingly, the Sheriff announced, he would begin to "closely scru-tinize all individuals" ordered released on monitoring by the courts. "Those who are deemed to be too high a security risk

. . . will be referred back to the court for further evaluation" within forty-eight hours.

While this policy debate aired in public, within the confines of the Cook County Jail the Sheriff had already begun his "administrative review" of the courts' bail orders and was refusing to comply with them in cases of his choosing. Contrary to the Sheriff's public statements, plaintiffs allege, no efforts were made to remand detainees to the court within forty-eight hours or otherwise to make alternative arrangements. Families and nonprofits posted four- and five-figure bonds on behalf of detainees and then—nothing, for days and even weeks. No notice or explanation was given to the persons detained or to their lawyers, their families, or anyone else.

For example: On February 23, 2018 a nonprofit posted $5,000 bond on behalf of plaintiff Taphia Williams. Sixty hours later she had not been released. After repeated telephone calls, a jail officer informed the nonprofit's agent that Williams's case was "under review" and assured him: "Your person will be taken care of in the order that the bond was posted." Williams's counsel filed this lawsuit on the evening of February 26. Williams was released early the next morning. This was the first and shortest of these plaintiffs' confinements.

Plaintiff Tony Mason posted $7,500 bond on February 26 but had not been released as of March 2, when his counsel moved for a rule to show cause why the Sheriff should not be held in contempt of the court's bail order. A hearing on the motion was set for 9:00 a.m. on March 7. The Sheriff released Mason at 4:00 a.m., five hours before the hearing. Plaintiff Gregory Cooper's story is essentially the same.

After posting $1,000 bond on his son's behalf, the father of plaintiff Xavier Webster was reduced to pleading by text message with a policy staffer in the Sheriff's office before his son was released nine days later.

Plaintiff Joshua Atwater, having spent a year on the Sheriff's monitoring program already, was re-arrested on February 21 after mistakenly missing a court date. He had bail reinstated by the court on the same terms as before on March 6. The Sheriff did not release him to monitoring until March 12, on the condition that he have no contact with his five children—a release condition not imposed by the court but cut by the Sheriff from whole cloth.

B. *This Lawsuit*

Williams filed this lawsuit in the Northern District of Illinois on February 26, 2018, while still in custody, seeking damages and an injunction, together with a motion to certify a class of all arrestees who had been, were, or would be ordered released on monitoring but detained by the Sheriff as a result of "administrative review." The other named plaintiffs were joined as they became known. Defendants are the Sheriff in his individual and official capacities, and Cook County itself (only because it pays for the Sheriff's office, so we will not refer to it again). See *Carver v. Sheriff*, 324 F.3d 947 (7th Cir. 2003).

On April 12, 2018 plaintiffs filed a second amended complaint pleading Fourth and Fourteenth Amendment claims under 42 U.S.C. § 1983 and state-law claims for race discrimination and contempt of court. 740 Ill. Comp. Stat. 23/5; 55 Ill. Comp. Stat. 5/3-6020; see 28 U.S.C. §§ 1331, 1367. On the Sheriff's motion under Federal Rule of Civil Procedure 12(b)(6), the district court dismissed plaintiffs' Fourth Amendment

claim with prejudice, sustained the procedural due process claim on the merits and the contempt claim by default, and dismissed the others with leave to replead. Plaintiffs' third amended complaint followed on October 15 with more factual detail and a substantive due process claim in place of the Fourth Amendment claim. On the Sheriff's renewed Rule 12(b)(6) motion, the court dismissed all claims with prejudice except the procedural due process claim, which it again sustained. The court also took up for the first time plaintiffs' motion for class certification, now as to only the surviving claim, and denied the motion.

Plaintiffs stipulated to dismissal with prejudice of the surviving claim. The district court entered final judgment in the Sheriff's favor on May 29, 2019. This appeal followed. Because plaintiffs have twice confirmed, once in their opening brief and again at argument, that the stipulated dismissal of the procedural due process claim was indeed with prejudice to refiling, we are satisfied they are not attempting an unauthorized interlocutory appeal. See *JTC Petrol. v. Piasa Motor Fuels*, 190 F.3d 775, 776–77 (7th Cir. 1999). The district court's judgment was final and our jurisdiction is secure. 28 U.S.C. § 1291.

II. *Analysis*

We review de novo the district court's decisions on motions to dismiss for failure to state a claim under Rule 12(b)(6). *Manistee Apartments, LLC v. City of Chicago*, 844 F.3d 630, 633 (7th Cir. 2016). We cannot review its class certification decision, as we will explain.

A. *Fourth Amendment*

Plaintiffs' core claims fit most comfortably within the language and jurisprudence of the Fourth Amendment, so we

devote most of our attention to it. The Fourth Amendment protects the right of the people to be secure in their persons against unreasonable seizures. *Manuel v. City of Joliet*, 137 S. Ct. 911, 917 (2017). It "establishes 'the standards and procedures' governing pretrial detention" in criminal cases. *Id.* at 914, quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975). The standard for pretrial detention is probable cause, that is, official knowledge of "facts and circumstances sufficient to warrant a prudent [person] in believing" the detainee has committed a criminal offense. *Gerstein*, 420 U.S. at 111 (quotation marks omitted). The procedure for pretrial detention, for imposing any "extended restraint of liberty" before trial, is a decision by a neutral and detached magistrate rather than a law enforcement officer. *Id.* at 114.

This case is not about the probable cause standard. No one in this case disputes the existence of probable cause to detain each plaintiff. The dispute is over procedure. The plaintiffs alleged that, by conducting independent reviews of the courts' bail orders and on that basis continuing to hold persons already admitted to bail without purpose or plan for their release, the Sheriff arrogated to himself a decision that was not his to make. These allegations stated a claim under the Fourth Amendment.

### 1. *The Fourth Amendment Applies*

The district court held that the Fourth Amendment does not apply because probable cause was uncontested and pretrial "conditions of confinement" are governed by the Due Process Clause, quoting *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006). As applied to plaintiffs' complaint (which is not really about the conditions of their confinement in the

Sheriff's jail, but the fact of their confinement), this earlier division of labor in our circuit's case law did not survive the Supreme Court's decision in *Manuel*. After remand from the Supreme Court, "wrongful pretrial custody" was the claim sustained under the Fourth Amendment. *Manuel v. City of Joliet*, 903 F.3d 667, 669 (7th Cir. 2018).

Wrongful pretrial custody is what plaintiffs complain of here. If plaintiffs' custody was wrongful, it was the Fourth Amendment that made it so, whether for want of probable cause, as in *Manuel*, or for want of a neutral decisionmaker, as in *Gerstein*, where the Court "decided some four decades ago that a claim challenging pretrial detention fell within the scope of the Fourth Amendment." *Manuel*, 137 S. Ct. at 917; see also *Albright v. Oliver*, 510 U.S. 266, 274 (1994) (plurality opinion) ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it."); *id*. at 290 (Souter, J., concurring in the judgment) ("it is not surprising that rules of recovery for such harms have naturally coalesced under the Fourth Amendment").

### 2.  *Pretrial Detention Requires a Neutral Decisionmaker*

On appeal, and after *Manuel*, the Sheriff does not argue that plaintiffs' Fourth Amendment claim is precluded by the Due Process Clause; he argues the claim fails on its merits. The Sheriff agrees that *Gerstein* requires "a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." 420 U.S. at 114. He points out that each plaintiff received just that. Whether, for how long, and at whose behest plaintiffs were detained thereafter are simply not matters of Fourth Amendment significance, according to the Sheriff.

We doubt the Sheriff would push this argument to the hilt. He could not plausibly argue the Fourth Amendment would pose no obstacle to his detention of plaintiffs after a non-prosecution decision on the same charges—or an acquittal, or a conviction. A court's bail orders are of the same stripe. We have consistently accorded such orders Fourth Amendment significance, though without detailed explanations. See *Driver v. Marion County Sheriff*, 859 F.3d 489, 491 (7th Cir. 2017) (reversing partial denial of certification of classes of detainees held unreasonably long times after release orders); *Harper v. Sheriff*, 581 F.3d 511, 514–15 (7th Cir. 2009) (reversing grant of class certification; constitutionality of prolonged detention after bond posted would depend on individual circumstances not suitable for class), citing *Chortek v. City of Milwaukee*, 356 F.3d 740, 747 (7th Cir. 2004), and *Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988); *United States v. Holmes*, 452 F.2d 249, 261 (7th Cir. 1971) (Stevens, J.) (re-arrest of defendant on bail violated Fourth Amendment), citing *Carlson v. Landon*, 342 U.S. 524, 546–47 (1952). It is appropriate here to explain why.

First, a core function of the Fourth Amendment is to put neutral decision-makers between unchecked official discretion and invasions of private liberty by search or seizure. *Lo-Ji Sales v. New York*, 442 U.S. 319, 326–27 (1979); *Camara v. Municipal Court*, 387 U.S. 523, 532–33 (1967). *Gerstein* performs this function explicitly. Under the law disapproved there, "a person charged by information could be detained for a substantial period solely on the decision of a prosecutor." 420 U.S. at 106. The law's fault lay not in letting the prosecutor reach "a conscientious decision that the evidence warrants prosecution," or determine probable cause in the abstract. *Id.* at 117; see *id.* at 119. It lay in letting the prosecutor decide to

"imperil the suspect's job, interrupt his source of income, and impair his family relationships" by "prolonged detention" before trial, or even to subject him to pretrial release on "burdensome conditions that effect a significant restraint of liberty." *Id* at 114. "The awful instruments of the criminal law cannot be entrusted to a single functionary," *id.* at 118, quoting *McNabb v. United States*, 318 U.S. 332, 343 (1943), especially one "engaged in the often competitive enterprise of ferreting out crime." *Id.* at 113, quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948).

In this case, plaintiffs allege that, in place of court-ordered release on specified terms, the Sheriff substituted "prolonged detentions" as well as "significant restraints" on pretrial release of his own devising. The practical result was that his sole exercise of discretion caused the jailing of each plaintiff for three to fourteen days. Those decisions, say plaintiffs, imperiled plaintiff Marcus Johnson's education and impaired plaintiff Joshua Atwater's family relationships, for example.

The teaching of *Gerstein* is unmistakable: these decisions were not the Sheriff's to make. "When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty." 420 U.S. at 114.

### 3.  *"Exhaustion" of Probable Cause*

Second, there is another, less direct path to the same conclusion, the course of which is indicated by language in other cases and roughly by plaintiffs' seemingly inconsistent arguments that the Sheriff imposed an unconstitutional "degree" of seizure on them or "re-seized them without probable

cause." These are not two inconsistent arguments but two imprecise expressions of the same argument (neither of which is therefore waived, *pace* the Sheriff), as follows.

It is axiomatic that seizures have purposes. When those purposes are spent, further seizure is unreasonable. See *Arizona v. Johnson*, 555 U.S. 323, 333 (2009); *Terry v. Ohio*, 392 U.S. 1, 19 (1968), citing *Warden v. Hayden*, 387 U.S. 294, 310 (1967) (Fortas, J., concurring); *Strand v. Minchuk*, 910 F.3d 909, 915 (7th Cir. 2018). At the time of the founding and still today, the primary purpose of an arrest is to ensure the arrestee appears to answer charges. This purpose is accomplished by bringing the arrestee promptly before the court so that it may issue one of three orders: discharge, commitment, or bail. See *Virginia v. Moore*, 553 U.S. 164, 173 (2008); *Gerstein*, 420 U.S. at 114–15 & n.14, citing among others 1 Matthew Hale, *Pleas of the Crown* 583–86, 589–90 (1736), and 2 Hale, supra, at 77, 81, 95, 121; *Albright*, 510 U.S. at 278 (Ginsburg, J., concurring), citing among others 3 William Blackstone, *Commentaries* *290; *County of Riverside v. McLaughlin*, 500 U.S. 44, 61 (1991) (Scalia, J., dissenting), citing among many others 2 Hale, supra, at 95 n.13 (1847) (1736). The arresting authority itself may accomplish the same purpose only if there is no prospect of pretrial detention or burdensome pretrial release conditions. E.g., *Portis v. City of Chicago*, 613 F.3d 702, 703–05 (7th Cir. 2010); see also 4 Blackstone, supra, at *297 (magistrates, not peace officers, under duty to bail).

Once the arrestee appears before the court, the purpose of the initial seizure has been accomplished. See *Albright*, 510 U.S. at 278 (Ginsburg, J., concurring) (purpose "equally answered" by detention or bail), quoting 3 Blackstone, supra, at *290. Further seizure requires a court order or new cause;

the original probable cause determination is no justification. See *Gerstein*, 420 U.S. at 114 n.14 ("a gaoler will expect a *Mittimus* for his warrant of detaining"), quoting 1 Hale, supra, at 590 (1736); *County of Riverside*, 500 U.S. at 61 (Scalia, J., dissenting) ("needed warrant for further detention"); *United States v. Holmes*, 452 F.2d 249, 261 (7th Cir. 1971) (Stevens, J.) ("[A] variety of valid causes for a rearrest of a person admitted to bail may exist, but . . . continuing knowledge of his possible guilt of the offense charged . . . is not itself sufficient"), citing *Carlson v. Landon*, 342 U.S. 524, 546–47 (1952); 4 Blackstone, supra, at *300 ("if the offence be not bailable, or the party cannot find bail, he is to be committed to the county gaol by the *mittimus* of the justice"). In formal terms, the original probable cause determination is said to have been "exhausted." *Carlson*, 342 U.S. at 546 (reversing denial of habeas corpus to detainee released on bail then re-arrested under original warrant), citing *United States ex rel. Heikkinen v. Gordon*, 190 F.2d 16, 19 (8th Cir. 1951) ("Ordinarily in criminal cases, where one has been released on bail he can not be rearrested in the same jurisdiction on the same charge on which he was originally arrested.").

In this case, no one disputes "the continuing existence of 'probable cause'" to believe plaintiffs committed the offenses charged. *Holmes*, 452 F.2d at 261. Once plaintiffs appeared before the court, however, such probable cause ceased to be a justification for the Sheriff's unilateral seizure. See *id.* Put differently, the original probable cause was "exhausted" by the courts' bail orders. *Carlson*, 342 U.S. at 546. This is the true sense of plaintiffs' "degree of seizure" and "reseizure without probable cause" characterizations. It is only another way of expressing our original conclusion: courts, not sheriffs, make pretrial detention decisions.

### 4. *Reasonable Administrative Delay?*

On the principle that bail orders terminate law enforcement's authority to seize on the same charges, courts tolerate only brief and reasonable administrative delay by a jailer in processing the release of an arrestee admitted to bail. In *Driver v. Marion County Sheriff*, reversing a denial of class certification, we addressed a proposed class of Fourth Amendment plaintiffs "composed of persons for whom legal authority for detention has ceased, whether by acquittal after trial, release on recognizance bond, completion of jail time in the sentence, or otherwise." 859 F.3d 489, 491 (7th Cir. 2017). As to that class, further detention was lawful for only such time as reasonably needed "to merely process the release." *Id.* In *Harper v. Sheriff of Cook County*, reversing a grant of class certification, we observed similarly that the constitutionality of "holding detainees after bond has been posted" depended on "whether the length of the delay between the time the Sheriff was notified that bond had been posted and the time that the detainee was released was reasonable in any given case." 581 F.3d 511, 514–15 (7th Cir. 2009).

In this case, there is no suggestion that the Sheriff was taking any steps, of any kind or at any speed, to process plaintiffs' release. It was precisely his opposition to their release that motivated his unilateral decision to continue their detention. These decisions cannot be justified on the basis of administrative delay.

### 5. *"Their Surety's Friendly Custody"*

In terms of Fourth Amendment doctrine, there is a further wrinkle, however. Plaintiffs allege that the Sheriff was their wrongful jailer, but he was also their rightful "surety," so to

speak, as the administrator of the electronic monitoring program to which they had been admitted. The relationship was custodial either way. "[H]e that is bailed, is in supposition of law still in custody," *Albright*, 510 U.S. at 278 (Ginsburg, J., concurring), quoting 2 Hale, *supra*, at 124 (1736), though in the "friendly custody" of his surety "instead of going to gaol." *Id.*, quoting 4 Blackstone, *supra*, at *297. That is not to say the common law regarded jail and bail as equivalent. To the contrary, "to refuse or delay to bail any person bailable is an offense against the liberty of the subject." 4 Blackstone, *supra*, at *297. Nonetheless, it was said: "The bail have their principal on a string, and may pull the string whenever they please, and render him in their discharge." *Taylor v. Taintor*, 83 U.S. (16 Wall.) 366, 371–72 (1872). Again: "Whenever they choose to do so, they may seize him and deliver him up in their discharge; and if that cannot be done at once, they may imprison him until it can be done." *Id.* at 371. And again: "the parties that take him to bail are in law his keepers, and may re-seize him to bring him in." 2 Hale, *supra*, at 124 (1736).

In this case, the Sheriff argues that plaintiffs had to be jailed because they "failed to secure enrollment" in his electronic monitoring program and could not be left at liberty without contravening the courts' bail orders. Grant the premises—setting aside the intolerable elision of the agent (plaintiffs did not "fail to secure enrollment;" the Sheriff denied them enrollment), as well as the irreconcilable conflict with the Sheriff's position on the contempt of court claim (where, as we explain below, the Sheriff argues the courts' bail orders were nullities he was free to disregard). Even so, this argument runs headlong into the limits of the surety's friendly custody.

We agree the Fourth Amendment did not oblige the Sheriff or anyone else to act as plaintiffs' surety even under court order. The Fourth Amendment is not a vehicle for enforcing the terms of state law. *Virginia v. Moore*, 553 U.S. 164, 178 (2008). Assuming the Sheriff was thus free to pull the string whenever he pleased, having pulled it he was most certainly not free to keep plaintiffs in custody indefinitely and without explanation. He was free only to deliver plaintiffs at once or to detain them very briefly until it could be done—to return them to court after a brief time needed for administrative purposes, as we would say today. *Taylor*, 83 U.S. at 371; 2 Hale, supra, at 124 (1736); see generally *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991). As explained above, "reasonable administrative delay" is not a plausible characterization of the Sheriff's unilateral detention decisions alleged in this case.

6.  *Conclusion on Fourth Amendment Claims*

We emphasize that we have neither the institutional competence nor the desire to manage Cook County's pretrial release program. See *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1075 (7th Cir. 2018) (court would not manage Cook County clerk's office); *SKS & Assocs. v. Dart*, 619 F.3d 674, 679–80 (7th Cir. 2010) (court would not manage Cook County eviction docket). Indeed, this court's scrutiny of proffered administrative justifications for detention could not be called unduly zealous. See *Chortek v. City of Milwaukee*, 356 F.3d 740, 750 (7th Cir. 2004) (Cudahy, J., concurring) (court accepted administrative justification for imposing expressly punitive booking procedure on repeat municipal ordinance violators resulting in detentions up to 14.5 hours).

The Fourth Amendment does not require any particular administrative arrangement for processing bail admissions. It

does require, however, that whatever arrangement is adopted not result in seizures that are unreasonable in light of the Fourth Amendment's history and purposes. "[I]f the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty," the Sheriff's flat refusal to heed the courts' bail orders alleged in this case, based on nothing more than a policy disagreement and resulting in unjustified detentions of multiple days, simply will not do. *Gerstein*, 420 U.S. at 114. Plaintiffs' complaint stated claims for wrongful pretrial detention under the Fourth Amendment.

B.  *Substantive Due Process*

In holding that the Fourth Amendment did not apply to the allegations of plaintiffs' second amended complaint, the district court suggested that the substantive component of the Due Process Clause might. On cue, plaintiffs' third amended complaint added a substantive due process claim, which the district court later dismissed for failure to allege conscience-shocking conduct by the Sheriff. See *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).

We agree that plaintiffs cannot obtain relief under the Due Process Clause, but for a different reason: the Fourth Amendment applies to plaintiffs' wrongful pretrial detention claims, so there is no need to resort to the "more generalized notion" of substantive due process. See *Graham v. Connor*, 490 U.S. 386, 395 (1989); see also *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (incorporation "has substituted, in these areas of criminal procedure, the specific guarantees of the various provisions of the Bill of Rights . . . for the more generalized language" of the Due Process Clause), *id*. at 288 (Souter, J., concurring in the judgment) ("the Court has resisted rely-

ing on the Due Process Clause when doing so would have du-plicated protection that a more specific constitutional provi-sion already bestowed").

Conditions of pretrial confinement, as opposed to the standards and procedures required to impose it, are subject to the Due Process Clause's prohibition on preconviction pun-ishment. E.g., *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018), following *Miranda v. County of Lake*, 900 F.3d 335 (7th Cir. 2018), following in turn *Kingsley v. Hendrickson*, 576 U.S. 389 (2015); see also *United States v. Salerno*, 481 U.S. 739, 746–47 (1987); *Bell v. Wolfish*, 441 U.S. 520, 535–37 (1979) ("For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). Similarly, the Due Process Clause limits the permissible bases for detention in general. See *Salerno*, 481 U.S. at 748–49 (danger to community is permissible basis). But plaintiffs do not challenge conditions in the Sheriff's jail, nor the state's authority to imprison them pending trial as a general matter. They challenge the fact of their detention as unreasonable under the circumstances. These claims do not invoke any substantive prohibitions implied in the Due Pro-cess Clause.

C.  *Equal Protection Under Federal and State Law*

The Equal Protection Clause of the Fourteenth Amend-ment prohibits intentional racial discrimination. *Washington v. Davis*, 426 U.S. 229, 239 (1976). The parties agree with the dis-trict court that the applicable state antidiscrimination law reaches to the same extent.[1] Invoking both, plaintiffs allege

---

[1] It is not entirely clear what that law is. The Illinois Constitution con-tains an equal protection clause, art. I, § 2, which is analyzed the same as

that the Sheriff targeted them for detention in defiance of the courts' bail orders because of their race. The district court dismissed both claims, holding that plaintiffs' complaint did not contain plausible, nonconclusory allegations of intentional discrimination. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). We respectfully disagree; we are reviewing only pleadings, not evidence.

The questions under Federal Rule of Civil Procedure 8(a)(2) are whether the defendant has fair notice of what he must defend himself against and whether there is some reason to believe he could be found liable at the end of the case. *Freeman v. Metro. Water Reclamation Dist.*, 927 F.3d 961, 965 (7th Cir. 2019) (per curiam); *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1028 (7th Cir. 2013); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Plaintiffs alleged that the Sheriff targeted them for detention "because of their race." That is fair notice. Plaintiffs alleged further that the Sheriff's bail review policy "disproportionately targets African Amer-

---

its federal counterpart, *People v. Perea*, 807 N.E.2d 26, 38 (Ill. App. 2004), but "it appears there is no private right of action under Article I, Section 2." *Rodriguez v. City of Chicago*, 370 F. Supp. 3d 848, 856 n.4 (N.D. Ill. 2019). The Illinois Civil Rights Act of 2003, 740 Ill. Comp. Stat. 23/5, creates two separate causes of action, *id.* § 5(a)(1)–(2), which have been held only to provide a state forum for federal rights under Title VI and Title VII, respectively, of the Civil Rights Act of 1964. See *McQueen v. City of Chicago*, 803 F. Supp. 2d 892, 906–07 (N.D. Ill. 2011), citing among others *Ill. Native Am. Bar Ass'n v. Univ. of Ill.*, 856 N.E.2d 460, 467 (Ill. App. 2006) ("the Act was not intended to create new rights"). Plaintiffs pleaded a nonspecific claim under the statute, but the district court applied the constitutional standard without objection from either side. This question of state law may need further attention on remand.

icans by using charge, prior arrests, and neighborhood to determine eligibility for release." As a result, more than four in five of the more than eighty or so people detained by the Sheriff after being admitted to bail by the courts were black. At the pleading stage, those allegations offer sufficient reason to believe the Sheriff could be found liable for intentional discrimination.

"Outright admissions of impermissible racial motivation are infrequent." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). A policy's use of facially neutral criteria raises an inference of impermissible intent when those criteria map so closely onto racial divisions that they allow racial targeting "with almost surgical precision." *North Carolina State Conference of the NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016); see *id.* at 225 (voting history as proxy for race). We may take judicial notice that Chicago is consistently ranked among the most racially segregated cities in the country. *EEOC v. Chicago Miniature Lamp Works*, 947 F.2d 292, 294 & n.1 (7th Cir. 1991); *Clark v. Universal Builders, Inc.*, 706 F.2d 204, 211 (7th Cir. 1983); see also, e.g., Alana Semuels, *Chicago's Awful Divide*, The Atlantic (Mar. 28, 2018), available at theatlantic.com/business/archive/2018/03/chicago-segregation-poverty/556649. Under these conditions, neighborhood was a plausible proxy for race. Arrest history was another, in light of Chicago's alleged history of disproportionately arresting African Americans (an allegation endorsed by the U.S. Department of Justice in 2017). Pending charges may have been another, but the proxy mechanism was unexplained and the first two are enough.

The district court found plaintiffs' allegations to be "suspicious at first glance." That is a fair way to articulate the gov-

erning pleading standard. Supporting "each evidentiary element of a legal theory" is for summary judgment or trial, not a test of the pleadings under Rule 12(b)(6) or 12(c). See *Freeman*, 927 F.3d at 965; see also, e.g., *Bennett v. Schmidt*, 153 F.3d 516, 518–19 (7th Cir. 1998) (no "requirement that complaints contain all of the evidence needed to prevail at trial"; "resolving under Rule 12(b)(6) matters that formerly were handled by summary judgment" is "incompatible with the Rules of Civil Procedure"). The Sheriff's contrary arguments go well beyond plaintiffs' pleading burden under Rule 8 and cannot be fairly entertained at this stage.

First, the Sheriff faults plaintiffs for failing to plead "the nature or severity of *their own* pending charges or criminal backgrounds." We search Rule 8 and cases interpreting it in vain for a requirement that a plaintiff plead the defendant's defenses for him. See *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). The Sheriff would also have us ignore as "conclusory," for example, plaintiffs' allegation that his "administrative review" policy was based on "racist assumptions about the likelihood that people from primarily African American neighborhoods pose a public safety risk or are likely to reoffend." Because we can think of no cause of action that contains as an element proof of racist assumptions about neighborhoods in Chicago, plaintiffs' allegation cannot fairly be characterized as conclusory. See *Iqbal*, 556 U.S. at 678. Finally, leaning heavily on *Iqbal*, the Sheriff argues there are good reasons to believe his policy was race-neutral in conception and execution. That may or may not be so, but in any event "[l]itigants are entitled to discovery before being put to their proof." *Bennett*, 153 F.3d at 519. *Iqbal* is not a mandate to weigh a plaintiff's likelihood of ultimate success at the pleading stage. See 556 U.S. at 678 ("The plausibility standard is not

akin to a 'probability requirement'"). Instead it demands "more than a sheer possibility" of liability. *Id.* Alleging merely that defendants "approved" a policy of arresting and detaining "Arab Muslim men" was not enough in that case arising in the immediate wake of the terrorist attacks of September 11, 2001, *id.* at 681, but there is a good deal more to plaintiffs' complaint here. The district court erred in dismissing plaintiffs' equal protection claims on the pleadings.

### D. *Contempt of Court*

Illinois law affords a private right of action to anyone injured by a sheriff's contumacious refusal to comply with a court order "legally issued to him." 55 Ill. Comp. Stat. 5/3-6020. Plaintiffs allege they were injured by the Sheriff's contempt of the Cook County courts' bail orders. The Sheriff's motion to dismiss responded that the orders had not been legally issued to him. The district court agreed with the Sheriff, interpreting the Illinois Bail Act to authorize a court to impose electronic monitoring as a condition of release but not to order any particular person to administer the monitoring. On this theory, the Sheriff did not disobey valid court orders in refusing to administer plaintiffs' monitoring. The district court's interpretation of the Bail Act may or may not have been correct as matter of state law, but correctly interpreting the statute was only half the battle—which, when fought to the end, plaintiffs ought to have won, at least at the pleading stage before the facts have been developed.

As a general matter, courts have little patience with parties who decide to violate court orders they disagree with rather than challenge them through orderly legal channels. The canonical precedent on this point is *Walker v. City of Birmingham*,

388 U.S. 307 (1967), which affirmed contempt of court convic-
tions of leaders of a civil rights march in 1963. A local parade
ordinance imposed restrictions on the proposed march that
the Supreme Court assumed would violate the First Amend-
ment. But city officials had also obtained from a state court a
temporary restraining order against the march and had the
order served on the march organizers. The organizers did not
try to challenge the restraining order (itself of dubious consti-
tutionality). They chose instead to declare publicly their in-
tention to violate the order, and they did so. 388 U.S. at
309–10. Several organizers were convicted of criminal con-
tempt of court. The Supreme Court of the United States af-
firmed those convictions.

The case tested the rule of law as applied to the civil rights
movement. Despite the Court's pivotal role in protecting the
legal rights of civil rights advocates, the Court held that the
marchers could not avoid the consequences of violating the
court order even if the order violated their First Amendment
rights. The marchers were "on notice that they could not by-
pass orderly judicial review of the injunction before disobey-
ing it." 388 U.S. at 320. The Court explained: "The rule of law
that Alabama followed in this case reflects a belief that in the
fair administration of justice no man can be judge in his own
case, however exalted his station, however righteous his mo-
tives, and irrespective of his race, color, politics, or religion.
. . . One may sympathize with the petitioners' impatient com-
mitment to their cause. But respect for judicial process is a
small price to pay for the civilizing hand of law, which alone
can give abiding meaning to constitutional freedom." *Id*. at
320–21.

To avoid the general principle exemplified by *Walker*, the Sheriff points to *People v. Stinger*, 317 N.E.2d 340 (Ill. App. 1974), as addressing the "very issue" in this case. We do not read *Stinger* that way. A prosecutor was held in contempt of a trial court's order to have grand jury proceedings transcribed by a court reporter. *Id.* at 341. The question on appeal from the contempt finding was not whether the trial court's order was "improper" or "merely erroneous" as a matter of law. *Id.* at 342. The question was whether the prosecutor was free to disobey it, without resort to judicial process, on the theory that the order had been entered without jurisdiction and was "utterly void." *Id.*

An order is not void for lack of jurisdiction when entered with personal jurisdiction, subject matter jurisdiction, and "power in the court to decide the particular matter presented." *Id.* The "correctness of the court's determination has no bearing upon the initial question of jurisdiction." *Id.* As the Law Lords have put it, "Jurisdiction to go right" is "jurisdiction to go wrong." *Anisminic Ltd. v. Foreign Comp. Comm'n* [1969] 2 AC 147 (HL) 171.

The Illinois Bail Act authorizes a court to impose among many others the following conditions of release on a person admitted to bail:

> (13) Remain in the custody of such designated person or organization agreeing to supervise his release. Such third party custodian shall be responsible for notifying the court if the defendant fails to observe the conditions of release which the custodian has agreed to monitor, and shall be subject to contempt of court for failure so to notify the court;

(14) Be placed under direct supervision of the Pretrial Services Agency, Probation Department or Court Services Department in a pretrial bond home supervision capacity with or without the use of an approved electronic monitoring device subject to Article 8A of Chapter V of the Unified Code of Corrections . . . .

725 Ill. Comp. Stat. 5/110-10(b). The Sheriff points out that he is not a pretrial services agency, probation department, or court services department, and he says emphatically that he "*did not agree*" to administer plaintiffs' electronic monitoring under § 10(b)(13).

That is not an issue that we can decide on the pleadings. A bit of needed context is supplied by a document attached to plaintiffs' complaint: an e-mail dated March 10, 2018 from the Cook County State's Attorney's office to the Sheriff's office, in response to the Sheriff's requests that the prosecutors object on his behalf to bail orders committing persons the Sheriff deemed "ineligible" to his monitoring program. See *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). The State's Attorney explained that the Sheriff had been obeying monitoring orders issued to him as an "agreeable third party" under § 110-10(b)(13) "for decades" without objection. If the Sheriff's position had changed, it was his responsibility "to either follow the court's orders or seek appropriate relief from the orders." But the Sheriff had chosen to litigate neither the monitoring orders themselves nor the show-cause motions filed by plaintiffs and others (instead releasing them just before the hearings could be held, as plaintiffs allege). The prosecutors

said they would start objecting to further issuance of such orders only after the Sheriff had established the orders' unlawfulness through the "simple legal path available."

Additional context is supplied by one of the only two bail orders in the record.[2] These documents are central to plaintiffs' complaint and referred to in it, so they may be considered regarding the sufficiency of the pleadings. E.g., *Williamson*, 714 F.3d at 436. The order issued in the case of plaintiff Williams ordered that she "shall remain on Electronic Home Monitoring" and that "The supervising authority shall be the Cook County Sheriff's Office." Critically: "If the Defendant cannot be placed on Electronic Home Monitoring for any reason, the Defendant shall be remanded to the court within 72 hours." (The complaint alleged carefully that Williams "spent more than 72 hours in custody" after the court ordered that she be admitted to bail.)

Against this statutory and factual backdrop, our task is to predict whether the Illinois Supreme Court would agree with the Cook County State's Attorney (and presumably the Cook County trial courts) that the Sheriff was required to seek review and reversal of the trial courts' bail orders before disregarding them; or whether it would agree with the Sheriff that those orders were written on water. We think the former is more likely.

---

[2] The bail orders are obviously at the center of all the claims in plaintiffs' complaint, but the only two orders in the record appear as attachments to the Sheriff's opposition to class certification. They are not cited by either side on appeal, though the Sheriff's brief purports to summarize the contents of more than eighty such orders, all without citation. The limitations of the record in this critical area further illustrate the inadvisability of dismissing this case on the pleadings.

Apparently the only legal question is whether the Sheriff was correctly determined to be an "agreeable third party" under § 110-10(b)(13) of the Bail Act. A trial court acting within its jurisdiction to set bail in a criminal case would of course have the power to decide this question. See *Stinger*, 317 N.E.2d at 342. The trial court would not forfeit this power by concluding that an "agreement" under the statute had been established over "decades" of acquiescence and would not be set aside without some notice to the court. In other words, if the Sheriff was going to change his policy toward these court orders, the Illinois courts could reasonably conclude as a matter of state law that he needed to bring that subject up immediately with the courts, not silently refuse to comply while holding plaintiffs as pawns in an interbranch policy dispute.

Alternatively, an "agreement" under the statute was arguably conceded by continuing to hold a person admitted to bail where the option existed to remand her if she could not be admitted to monitoring "for any reason." Compare *Stinger*, 317 N.E.2d at 343 (order void without conceivable statutory basis and no supervisory authority over independent constitutional officer). Such an interpretation may have been reversed on appeal, but we think Illinois requires adherence even to the reversible interpretations of its trial courts otherwise acting within their jurisdiction until they are reversed. See *id.* at 342, quoting *Cummings-Landau Laundry Mach. Co. v. Koplin*, 54 N.E.2d 462, 470 (Ill. 1944).

Whether the Sheriff could in principle be held in contempt of monitoring orders issued to him under § 110-10(b) is distinct from the question whether and to what extent he could be held liable for contempt of any particular order here. We

are not told and do not yet know how these orders operated in practice, but the two examples in the record before us seem to differ materially. The first was issued in plaintiff Williams's case, described above. The second was issued in the case of putative plaintiff class member Deavonte Kimble. Unlike the Williams order's mandatory language that Williams "shall" be placed on monitoring and that the Sheriff "shall" supervise it, Kimble's order provided that, "in the event the Defendant is admitted to bail," he shall comply with the following condition: "Other as specified: EM as SCOB." The Sheriff suggests this stands for "electronic monitoring as a special condition of bond." Whatever it stands for, Kimble's order did not on its face direct the Sheriff to do anything. It did not direct Kimble's release or admit him to bail. It is not clear that anyone but Kimble could be held in contempt of it. But it is also plausible that these orders should not be considered in isolation, without reference to established practices and expectations in the high-volume world of the Cook County Circuit Court.

The specific terms and practical effects of the order or orders issued in each plaintiff's case no doubt inform proper analysis of liability, damages, and class certification on plaintiffs' contempt claims. But the district court did not reach these issues; it held that the Sheriff could never be issued a valid order under § 110-10(b) at all. We disagree for the reasons we have explained, so these issues will need further consideration on remand.

E. *Class Certification*

Having granted most of the Sheriff's motions to dismiss, the district court considered plaintiffs' motion for class certification only as to the sole survivor of its dismissal orders, the

procedural due process claim. Before taking this appeal, plaintiffs abandoned that claim by voluntarily dismissing it with prejudice, so there is nothing in the district court's certification denial for us to review that would not result in an advisory opinion. The district court on remand, not this court on appeal, should be the first to address class certification as to the claims revived by this decision. See *Metro. Milwaukee Ass'n of Commerce v. County of Milwaukee*, 325 F.3d 879, 884 (7th Cir. 2003).

The district court's judgment of dismissal is AFFIRMED as to plaintiffs' due process claims. The judgment is otherwise REVERSED and the case is REMANDED for further proceedings consistent with this opinion.